POLICE JURY—RIGHT BANK—FOR THE USE OF THE NEW ORLEANS, OPELOUSAS AND GREAT WESTERN RAILROAD COMPANY *v.* SUCCESSION OF JOHN McDONOGH.

The Act of March 12, 1852, "providing for the subscription by the parishes and municipal corporations of this State to the stock of corporations undertaking works of internal improvements, and for the payment and disposal of the stock so subscribed"—is constitutional.

The restrictions imposed by Articles 108 and 109 of the Constitution of 1852, upon the aid which the State may grant to corporations for internal improvements, is no limitation upon the aid which the Legislature may authorize the Police Juries, &c., to grant.

The provision in the Act of 1852, requiring that no ordinances imposing a tax for works of internal improvements shall be valid, unless it has been ratified by a majority of the voters on whose property it is proposed the tax shall be levied—is not unconstitutional, nor at variance with the spirit of representative government.

The burden imposed under the Act of 1852 is a tax, with regard to which each citizen has not a right to decide, authoritatively, for himself alone, whether the tax is for a useful purpose, and will redound to his individual advantage.    If each citizen can be permitted to complain that his tax has been increased without his individual assent, and for a purpose of which he, individually, disapproves, all government would be at an end.    Of the public good which warrants a tax, the Legislature, for general purposes, and the duly constituted local authorities, acting under the express will of the Legislature for local purposes, are to judge.

The power of taxation, and that of taking private property for public use, are distinct things.    In the latter case, previous compensation must be made.    In the former, though in taking a man's money by taxation you do take his property, the compensation is considered as simultaneously given in the benefit, which, as a citizen, he enjoys in common with his fellow-citizens, in the public welfare and the public prosperity, to the advancement of which the money is to be applied.

The provision that the contribution levied shall entitle the contributor to stock in the corporation, cannot be regarded as a grievance, and in no respects changes its character as a tax.

The Supreme Court will exercise a discretion in entertaing appeals from *pro forma* judgments. The review of a *pro forma* judgment is not the exercise of original jurisdiction. And there can be no good objection to it in a case like this, where no question of fact is involved, and where the judgment was entered up in good faith, in order to speed the trial of a cause of great public importance.

APPEAL from the Third District Court of New Orleans, *Kennedy*, J. *Cohen* and *R. Hunt*, for plaintiff and appellant. *Grivot* and *L. Pierce*, for defendant. *Durant & Horner*, also for defendant, filed the following brief:

The plaintiffs claim $417, which they allege to be due to them for the amount of a tax assessed on the defendant's real estate lying within their jurisdiction.

This tax was assessed by the plaintiffs, in pursuance of an act of 12th March, 1852, entitled "An act providing for subscriptions, by the parishes and municipal corporations of this State, to the stock of corporations undertaking works of internal improvement, and for the payment and disposal of the stock so subscribed."

On an examination of the provisions of this act, it will be found to be repugnant to various articles of the Constitution of 1845, as well as of that which now exists, and to be totally in derogation of common right.

Section first of said act (see Acts, page 128) provides that it shall be lawful for police juries and municipal corporations of this State to subscribe to the stock of corporations undertaking works of internal improvement under the laws of this State, on complying with the provisions of this act."

Section second specifies the form in which the subscription ordinance of the Police Jury shall be framed.

The Legislature was without power to confer such an authority as this. Waiving, for a moment, the question of the power of the Legislature itself, under our Constitution, to embark in a system of internal improvement to the *unlimited* extent proposed in this section to be allowed to Police Juries, but admitting, for the sake of argument, that the power exists in them, i. e., the Legislature, let us consider whether that power could be delegated, without limit or restriction, to the Police Juries of the State.

The police Juries are political corporations.

*Vide Police Jury* v. *McDonogh*, 7 Martin, 17.
    *Same* v. *Fluker*, 1 Rob., 389.
    *McGuire* v. *Bry*, 3 Rob. 196.

The laws establishing them are ordinary acts of legislation, and are to be construed and applied in all cases like other laws.

*Vide Reynolds* v. *Baldwin*, 1 An., 162.

They are established for public purposes alone, and to administer a part of the sovereign power of the State over a small portion of its territory.

*Vide Police Jury* v. *Shreveport*, 5 An., 665.

The part of the sovereign power which this Police Jury administers is not defined in the act of 12th March, 1852, now in question, (*vide* Acts, page 128 and 129,) and must be looked for elsewhere. It will be found in the act of 28th March, 1840, entitled "An act to create a separate Police Jury in and for that portion of the parish of Orleans situated on the right bank of the river Mississippi."

*Vide* Bullard & Curry's Digest, page 657.

It has, by section 3d, page 658, Bullard & Curry's Digest, the same powers and subject to the same duties as the Police Juries of the other parishes of the State.

The powers and duties of Police Juries in general are defined in the act of 25th March, 1813, and the acts supplementary thereto.

*Vide* Bullard & Curry's Digest, pp. 639 *et seq.*

These powers and duties are purely those of administration of matters connected with the police and good order of the neighborhood; and hence the Police Jury is only authorized to sell and buy movable or immovable property, so far as either act may be necessary to the proper carrying out of their expressly delegated powers, which only, as a matter of course, they possess; being created by the Legislature alone, and having no power but such as is expressly conferred.

*Vide Police Jury* v. *Shreveport*, 5th An., 665.

What, then, is the true extent of the power conferred by the first section of the act of 12th March, 1852, on the Police Jury of this right bank? Nothing more than to subscribe for stock in such works of internal improvement as are necessary to them in performing the duties imposed upon, or the powers delegated to them. For unless this be the true extent and limit of the power conferred, then the Police Juries are absolutely without restriction in this regard; they may subscribe for stock, and so contract debts without limitation as to amount, and embark in works of internal improvement not only beyond the limits of their respective parishes, but even beyond the limits of the State itself. Such undertakings and enterprises as these were never contemplated by the Legislature when the Police Jury of the right bank was constituted, nor could they be allowed to raise money by taxation for any such purpose.

*Vide Municipality No.* 1 v. *McDonogh*, 2 R. 244.

 *Anthony* v. *Adams*, 1 Metcalf, 284, 286.

 *Parsons* v. *Goshen*, 11 Pick., 396.

 *Stetson* v. *Kempton*, 13 Mass., 272.

 *Norton* v. *Mansfield*, 16 do., 48.

The tax attempted to be enforced here is for a subscription to a railroad not necessary to any of the purposes for which Police Juries are created, and extending, or designed to extend, to the western border of Louisiana, and finally to the Pacific.

*Vide* act of 22d April, 1853, published in the Louisiana Courier of Tuesday, 17th May, 1853.

But a very insignificant portion of the road is intended to be within the territorial limits of the Police Jury of the right bank.

This law, then, of March 12th, 1852, under the interpretation put upon it by the plaintiff, empowers the Police Jury to subscribe for an unlimited amount of stock, in a road not necessary to their powers and duties of administration and police, and extending far beyond the limits of their parish. Such unlimited power cannot be conferred under a government where individual right is respected; it is essentially arbitrary and without restraint, and spurns all those limits fixed by the principles on which our institutions are founded, and which our Constitution recognizes as sacred; it is such a power which this Court has emphatically denied to exist in any of the departments of the State government, general or local.

*Vide Second Municipality* v. *Duncan*, 2d An., 185.

The Legislature has attempted to confer no such power as is contended for by the plaintiff. If the Legislature did make the attempt, the act is void, as being contrary to the Constitution.

The plaintiffs declare in their brief, that " The State Legislature has all the legislative power not inhibited by the Constitution of the United States, or by the State Constitution, or the principles on which our institutions are founded."

And this Court has said " that the State Legislature may do whatever is not prohibited by the (State) Constitution.

*Vide Bozant* v. *Campbell*, 9 Rob., 413.

The Court goes much further than the counsel, though the latter is certainly much nearer the truth.

There are many powers of sovereignty and government not expressly mentioned in the Constitution of the State, which, nevertheless, the Legislature cannot exercise: such as the powers surrendered to the General Government by the Federal compact; those enumerated in the Convention with the French Republic, by which Louisiana was ceded, and those enumerated in the Ordinance of Congress of the Old Confederation of 13th July, 1787.

*Vide Wardens of Church of St. Louis* v. *Blanc*, 8 Rob., 52.

He who should suppose, then, that the State Legislature is possessed of every power which the State Constitution does not expressly forbid it to exercise, would be very widely mistaken.

The Police Jury system existed in this State before the Constitutions of 1845 and 1852; the powers and duties of Police Juries were well defined; and those Constitutions were framed with reference to Police Juries; their existence is recognized in them.

The 7th Article in each Constitution declares, that " The Legislature may delegate the power of establishing election precincts to the parochial or municipal authorities." This may be construed very properly to mean that the Legis-

lature *may not* delegate to the parochial authorities, other powers usually exercised by the Legislature only.

It must indeed be admitted as certain, that the Legislature cannot delegate to the parochial authorities a power which it does not itself possess.

The Constitution of 1845, Article 116, and that of 1852, Article 113, declare that " No lottery shall be authorized by the State " ( i. e., the Legislature ;) of course, then, a law authorizing Police Juries to carry on lotteries would be null and void. Many such examples might be given, but they are too plain for controversy.

Nor can the State Legislature effect indirectly, by delegation of authority to Police Juries, purposes which they are forbidden to pursue directly and by themselves.

The Legislature could not, by any act, transfer the whole legislative power of the State to the Police Juries (see plaintiff's brief, top of page 4, where this is admitted;) but under the mandate of the sovereign people, must carry on the legislation of the State itself; for the Constitution declares that the legislative power of the people is vested in two distinct branches, the House of Representatives and the Senate, and the power of legislation exists no where else.

The Constitution of 1845, Article 32, and that of 1852, Article 30, declares that " all bills for raising revenue shall originate in the House of Representatives." An act delegating to the parochial authorities the power to raise, by taxation, such sums as might be necessary to defray the expenses of the executive department, or any other State expenses, would be in conflict with these Articles. The Constitution intended to confine the raising of money from the people for general purposes to a particular body; and that body cannot evade the performance of the duty, and shift the responsibility of it upon others.

The 105th Article of the Constitution of 1852 provides, that " vested rights shall not be divested unless for purposes of public utility, and for adequate compensation previously made." The Legislature cannot evade this restriction, and delegate to the parochial authorities the right of taking private property for public use, without paying for it.

The Article 108 of the Constitution of 1852, prohibits the State, i. e., the Legislature, from subscribing for stock in a bank; now, the Legislature is elected by the people of all the parishes, and represents them; and the people of all the parishes are respectively the Police Juries. If all the Police Juries, by virtue of a general act of the Legislature authorizing and empowering them thereunto, should subscribe for bank stock, how would this differ, so far as respects results, so far as the wants, the wishes, the obligations of the people are concerned, from a subscription by the Legislature?

Further, and to come to the very case involved, in this very suit, what is the true meaning of all these Articles in the Constitution restricting the debts of the State? And, particularly, what is the meaning of Article 109 of the Constitution of 1852? Is it not that the people shall be protected from the imposition of the burthen of taxation for purposes of internal improvement, unless certain forms and conditions are complied with, and unless certain safeguards are provided for their protection? Is it possible, then, that the Legislature can, by a general law, produce or cause to be produced by others, the same effect of burthening the people with taxation, and at the same time, break through the conditions and overleap the barriers reared by the Constitution to protect the property of the citizens.

This Article 109 of the Constitution of 1852, limits the power of the Legislature, i. e. of the State, to a subscription within certain amounts, for the stocks of internal improvement companies, carrying on works " wholly or partially within the State." The limitation is salutary, and the reason of it manifest; it was intended to protect the citizens from being taxed for any work of internal improvement out of the State, and to prevent them from being taxed for any work within the State beyond a certain amount of money : there is a limitation of locality and a restriction of the sum to be subscribed. These limitations and restrictions are imposed for the benefit of the whole people of the State ; they are the mandate of the sovereign to his agents, which the latter may not transgress ; they must, on all sound rules of interpretation, be construed strictly in favor of the people, and against the Legislature.

But these restrictions are all evaded by the Act of 1852, by which the Legislature attempts to confer on Police Juries and political corporations, the power

to tax the people for works of internal improvement, whether within or without the State, and for an amount of money altogether unlimited.

Here is a clear evasion of the restrictions of the Constitution; the Legislature has no such power as to place a burthen upon the people of more than eight millions of dollars for these works, nor to carry on or aid in carrying them on, out of the State; the Legislature cannot then transfer such a power to the Police Juries or other political corporations, its subordinates.

The Acts of 12th March, 1852, on which plaintiffs rely, in its third section, provides "that no ordinance passed under its provisions shall be valid or take effect until it shall have been approved and ratified by a majority of the voters on whose property it is proposed to be levied."

*Vide* Acts 1852, p. 128.

And the same section provides that a majority of the said voters may reject the ordinance.

Acts 1852, p. 129.

If it should be deemed that the Legislature of our State possesses the Constitutional right to delegate such powers as are here claimed for the Police Jury; and if it should be further considered that the Police Jury may lawfully embark in enterprises of this nature; some further questions then remain to be settled, as to whether the mode in which the ordinance of the Police Jury is to be ratified, approved or rejected, be in accordance with the principles and spirit of the State Constitution and the theory of our institutions, or not.

The powers of the government of the State of Louisiana are distributed into three departments, (*vide* Constitution, Article 1st,) which is to be taken as meaning that the whole sovereign power of the people, so far as they have not delegated certain portions of the same to the General Government, is to be exercised by three distinct departments or bodies. And this Article further says, that those powers which are legislative are confided to one department called the Legislature, which means that the whole power of legislating in Louisiana, all sovereign powers which are not of a judicial or executive character, are vested in the Legislature, and in that department alone; no other department, nor any individual belonging to any other department, being allowed to exercise any legislative authority, do any legislative act, or perform any legislative function whatever.

Constitution, Art. 2.

An act of the legislative department, within its proper sphere, is binding on every individual of the State, when approved by the Executive, or adopted by the requisite majority, after his refusal to approve, and no further action of any kind is necessary. Such an act is unconditional and absolute as to its binding force.

Says the 3d Article of the Constitution, "the legislative power (i. e., the whole legislative power) of the State shall be vested in two distinct branches, the one to be styled the House of Representatives, the other the Senate."

The whole legislative power being vested in these two branches, they alone can legislate; no other department of government can; nor can all the departments combined; nor can a portion of the people, nor the whole people, for an attempt on the part of either of these to do so, would be an attempt to act in that in which the Legislature is exclusive; the sovereign power of legislation cannot, from its very nature, be vested in two distinct quarters at the same time, for the case of two sovereigns, operating at the same time and on the same subject, is an impossibility; and to say they can do so, is to employ a contradiction of terms.

An act, though in the shape of legislation, whose operation and effect are suspended until a certain power approves and ratifies it, is no law until the approval or ratification takes place. In such a case, the legislative act is really the ratification. Now, the Legislature of Louisiana is the sovereign power of the government in legislating, as the Judiciary is in judging. The judicial courts could not say, "We decide this case in favor of plaintiff, or in favor of defendant, but the judgment shall have no force or effect until submitted to a vote of the people, or to that of a fraction of the people, i. e., the owners of real estate, for instance, and ratified and approved by the majority of those who choose to come forward and vote." Apply the same illustration to the Executive, and suppose that the Governor, when an act of the Legislature is submitted to him, under the provisions of Article 53d of the Constitution, should

44

approve and sign the same, but with the condition that it shall be submitted to the people, or a part of them, for ratification; his conduct would appear absurd, and as evincing a desire to avoid the responsibility of his official position; it would, in short, be an unconstitutional attempt, and render his approval of the act a nullity; for his whole constitutional power, as well as his duty, is to approve or to return the bills sent to him; he cannot do less—he cannot do more. Yet, as an independent department of the government, as bearing the delegation, to the exclusion of all others, from the sovereign people, of the power to approve and execute the law, he stands on the same footing precisely with regard to an appeal to the people, as the Legislature, and both the Executive and the Judiciary Department have this right, if the Legislative Department enjoys it; and this conclusion, irresistible from the premises, would throw society into confusion, and set the Constitution at defiance, by breaking through its most positive and clearly defined injunctions.

When the Legislature, i. e., the Senate and House of Representatives, have passed an act, and it has been approved by the Governor, it is complete: no power, but that of the Judiciary, can defeat it, and that only in specified cases; whether the people approve or disapprove, is immaterial—it is the law. The people cannot vote upon it—that would be legislating; they have reserved no legislative power; they have transferred it entire to the Legislature: that body must execute its trust: it must bear the whole weight of the responsibility of its acts. The people, as a political body, have but one way to act upon laws; they may choose a Legislature which will repeal or modify the act; beyond this the people can do nothing. The Constitution permits nothing else to be done; and the Constitution is just as binding upon the whole mass of the people in their aggregate capacity, as upon a single individual of their number. This obligation of all constitutional provisions upon the mass is essential to preserve the rights of individuals and of the minority, ever a jealous object of care in a republican government, but which would be the sport of the will of the majority, unless the view now taken be correct.

In short, there is but one, and only one case in which a law can be submitted to the popular vote, and that is a law amendatory of the Constitution.

*Vide* Constitution, Art. 141.

The course of reasoning here adopted is as applicable to the case of an Act of a Police Jury, as an Act of the Legislature. The body called the Police Jury is composed of members elected by the subdivisions or parochial wards: it is the Legislature of the Parish. All matters of legislation, fit and proper to be decided by the government of a parish, and coming with propriety under its jurisdiction, are to be passed upon by the Police Jury, and by it alone. The Police Jury represent, not only the owners of real estate within its territorial jurisdiction, but they are political agents, for local purposes, of the whole body of the inhabitants of the parish.

Act 25th March, 1813, section 2, Bullard & Curry's Digest, p. 639.

Act 9th March, 1846, p. 5.

These inhabitants carry on their local legislation, not by a popular assembly, or by their own immediate deliberation and decision, but by their agents and representatives, the Police Jury, who "are empowered to make all such regulations as they may deem expedient," for certain local purposes specially enumerated.

Act of 25th March, 1813, sec. 5, Bullard & Curry's Digest, p. 640.

Act of 9th April, 1847, pp. 81, 82.

Now, the very constitution of the Police Jury likens it, in every respect, to the Legislature: the members represent the people; they are empowered for certain purposes to pass laws: this right must exist without control: the ordinance they pass must either be valid and binding on the representative by the will of the legislative body, or it is altogether null. But the third section of the Act of 1852 provides that the Police Jury may pass an ordinance, and the owners of real estate approve or reject it: and without the approval of the real estate owners, the ordinance is null. We have already shown that under our constitution neither the people, nor any portion of them, can be called in to act in this way. Ratification or approval of an ordinance is legislation; and no power of legislation exists in the people; the whole legislative power is vested, by the constitution, in the legislature; and if they, the legislature, can, for definite and specific purposes, delegate a portion of that legislative power to

political corporations, which were in existence when the constitution was adopted, and whose existence and usefulness is recognized by that instrument, yet the power so delegated must be employed in accordance with established usage and the analogies of the case. The legislature of the State cannot constitutionally confer on the people, or the real estate owners of any parish, the capacity to legislate. Though it may say, certain legislative powers of local police requirement WE will not exercise, but will leave them to be exercised by a subordinate and co-operating legislature, the Police Jury; yet they cannot make the exercise of the power of that Police Jury to depend on the vote of a portion of the inhabitants. Under our system of government, which is a *representative* democracy, the people do not legislate, do not judge, do not execute, whether for general or special purposes; they elect certain citizens to do all these things; none others can do them: the people, in their original capacity, can do none of them. To attempt to call the original mass of the people into action for these purposes, is to pervert the whole theory and essence of our institutions: and if carried out to its consequences, will necessarily destroy them.

Now, the Court will observe that the Act by which this tax is claimed from us derives its whole vigor from the vote of the majority of the real estate holders of the right bank; it is their exercise of a power which they did not possess, and which the legislature could not constitutionally confer upon them: hence, for this essential nullity, the whole law is void and of no effect. "For under our system, statutes and ordinances are entire; one portion cannot be enforced alone, and the other parts declared null. If some of the provisions are illegal, the whole is null."

*Vide The Second Municipality* v. *Morgan,* 1 Annual, 111.

The whole of this Act is but an incarnation of legislative mendacity; to enforce it, or to allow the plaintiffs to recover, would be to give effect to an untruth.

It purports to be an Act to authorize municipal corporations to subscribe to the stock of companies prosecuting works of internal improvement. It is no such thing. It never was intended that the municipal corporations should take or own any such stock, nor can they do so by the terms of the Act.

The 4th section of the Act provides that the stock subscribed shall *not* belong to the municipal corporation subscribing for it, nor even be administered by them—vide Acts, page 129; but the stock shall belong to those who pay the taxes.

The corporation, plaintiff herein, is an intellectual being, different and distinct from all the persons who compose it. La. Code, art. 426.

Hence, the plaintiff, the Police Jury, though it might subscribe for stock for itself, could not subscribe for stock for any one of the inhabitants, nor for all the inhabitants in their individual capacities: yet this is what the law attempts to do, or authorizes the Police Jury to do. Such an attempt must be treated as a nullity. The Police Jury subscribes for what does not belong to it, (Louisiana Code, 427,) and controls the mode of payment for the property, when others have the title and administration.

The intent and effect of such a law is plain; it is to force individuals to take and pay for stock in a railroad company, whether they wish it or not; whether they think the enterprise likely to be beneficial or not: in short, whether they approve it or disapprove it. This is mere spoliation. The genius of our people and our institutions require that each man should be left free to invest his capital in such mode as to him shall seem most beneficial; and to control his judgment by the action of a majority, even were that majority all the members of the community except himself, would be an act of tyranny incompatible with our system of government.

The act of the majority is in no case considered the act of the whole, unless that majority is of the members of a regularly organized body, established, constructed, recognized by law; such as a sovereign State, a political or private corporation. In these, the majority of the members bind the minority, when the question is taken upon one of the subjects or interests committed to the whole body (Louisiana Code, article 435). But in the case before the Court, to whom was the question of the ratification of the ordinance subscribing stock in the Opelousas Railroad submitted? and what was the real question submitted to them?

The question was submitted to the vote of the owners of real estate in the part of the parish of Orleans on the right bank of the river.

And the real question was—shall we, i. e., each of us, take stock in proportion to the value of our real estate?

And it is contended that, as more than half of the owners of real estate said, we will take stock, the others are bound to take it too. Now, such a result can only follow if the owners of real estate on the right bank are a corporation, and were voting on a question within their corporate powers. But they are not a corporation. It is the whole of the inhabitants there, and they alone, who are incorporated and represented by the Police Jury; the owners of real estate have no corporate existence : they can neither sue nor be sued as a body. They enjoy no public character : in short, they have no corporate character or powers. Upon what ground, then, of law, of reason, or of common justice is it that ninety-nine of them even can say to the hundredth, you must do as we do. This is a merely tyrannical perversion of the law that the majority governs : in which corporate rapacity, speculation and cupidity apply a rule, applicable only to political action, to the management of private interests and affairs, impudently and audaciously asserting that a stock subscription is a tax, and a mere private undertaking may defray its expenses by spoliating those who desire no connection with it.

The plaintiffs say in their brief, page 4, "that all property within the State is held subject to the power of constitutional taxation, by the legislature, for general purposes, and all property within the several local divisions of the State is held subject to such taxation, for local purposes, as may be lawfully imposed upon the local property by the local authorities."

They rely upon these well recognised and undeniable principles to justify the present demand for payment of what they style a tax for local purposes.

The application of the principles, here announced, to the present case involves, we submit, two important errors.

In the first place, the enterprise of building a railroad from the parish of Orleans to the Pacific, or even to the State line, can, in no sense of the terms, be called a local purpose : it may be designed to benefit the locality where the road commences, but to call it a local improvement, on that ground, is a confusion of terms, which would make every undertaking, however general, of only local importance, and destroy the distinction in idea between what is general and what special.

In the second place, the contribution which the defendants are called upon to pay is not a tax.

A tax is a burthen, charge, or imposition, set on persons or property for public uses; exactions to fill the coffers for the payment of the debt and the promotion of the general welfare of the country.

*Second Municipality* v. *Morgan,* 1 Ann. 115.

The exaction now made upon the defendants cannot be brought within this definition. It is not laid for "public uses," but to aid an incorporated railroad company, composed of citizens who are combined together for the sake of individual gain, and who, without that incentive, would not combine ; their uses are no more "public," in the sense of the word as it is employed in the above legal definition, than any other commercial speculation. A public use is one in which the whole nation or sovereignty is interested (Louisiana Code, article 444) ; or the meaning may even be narrowed down, in the present instance, to a purpose in which the whole of the inhabitants of the parish is interested, but still it would be unsuitable, for not one cent of the profits of the railroad company will go into the coffers of the Police Jury; as the stock to be given in exchange for the pecuniary exaction, is not to belong to the local government, nor even to be administered by it; and hence the purpose and object of the contribution is not public, but private, in the strict sense of the term.

A company, chartered to construct and carry on a railroad, is a private corporation. Louisiana Code, article 420.

The plaintiffs have also adopted another idea, which may be ranked among those popular delusions, not the smallest of which was exemplified in an ingenious attempt of the eminent financiers, who once conducted the business of the Municipality No. Two, to persuade property holders that taxation was a blessing to them, and that by having a portion of their property taken away from them, they were really to be made richer. This scheme, however, was liable to

a serious objection in the minds of honest men. It was thought to be but a <span style="float:right">POLICE JURY</span> genteel mode of appropriating property without the consent of the owner, and <span style="float:right">*v.*<br>SUCCESSION OF</span> as such, declared by the Supreme Court of this State, to be illegal and worthy <span style="float:right">MCDONOGH.</span> of utter reprobation.

*Vide Municipality No. Two* v. *Morgan*, 1st Annual, 111.

The present notion seems to be, that it is only necessary to call an enterprise a public one, and that every individual can then be compelled by a vote of the majority, to invest his means in it. What would be thought if a question of some colossal speculation in cotton, or other produce, were ordered by the legislature to be submitted to the vote of the merchants of New Orleans, and the minority forced to embark in it, though unwillingly? There is no doubt that such a law would be denounced as a gross violation of common right.

In the case before us, the projected improvement, or railroad, may be termed public, and so it is as far as it is open, notorious, seen by all, but not in the sense of belonging to the sovereign or nation, as the word is used in our Code, and which is its legal, as distinguished from its ordinary meaning.

Having pronounced it a public work, the plaintiffs then declare that, even if the contribution voted in its favor is not strictly speaking a tax, yet that the laws of society require that private property should be yielded for the public good, when the public necessities require it.

The sovereign power is indeed vested with the right of eminent domain.

*Vide* Vattel's Law of Nations, book 1, chapter 20, and this principle is incorporated in the Louisiana Code, articles 489 and 2604.

And it may further be admitted that the legislature may delegate this power for specific purposes, to political or private corporations; but it cannot be successfully maintained that the legislature can delegate this important power, freed and unshackled from the essential condition imposed upon its exercise in all civilized States, to wit: that of paying for the private property taken, and of giving "an equitable and previous indemnity."

*Vide* Vattel and the Code, as cited.

But in the case before the Court, no indemnity is given for the money attempted to be taken from the pocket of the defendant. What indemnity, indeed, could there be but an equal amount of money? The plaintiffs say, in pursuance of the Act of 1852, we give you stock in our company to the same nominal amount, and this is your indemnity; but such a reply is a mockery.

*Vide Baker* v. *Boston*, 12 Pickering, 184.

  *Taylor* v. *Porter*, 4 Hill, 140.

The compensation or indemnity does not consist in any actual or expected improvement, or profit, to the individual deprived of his property, but can only be made in money.

*The People* v. *The Mayor of Brooklyn*, 6 Barb., Supreme Court Rep., 209.

*M. M. Cohen*, for plaintiffs and appellants.*

Petitioners claim the amount of the Parish tax of one per cent., for the year 1853, levied by them on the landed estate of defendant, in the parish of Orleans, within their jurisdiction.

This tax was levied by virtue of an Act of the Legislature of Louisiana, approved 12th March, 1852, and No. 175, under which law appellants, on the 16th July, 1852, subscribed to the stock of said Railroad Company, and also by virtue of the ordinance passed by petitioners, and approved December 6, 1852, by a majority of the voters, at an election held in conformity with said Act, No. 175, Session 1852.

Defendant resists said claim, on the ground that the law of the Legislature of 1852, and the ordinance under which these proceedings were had, are illegal and contrary to the constitution of the State, and of the United States.

It is obvious that the only issue made by the pleadings is a legal one, a constitutional question.

Appellants aver that the Act of the Legislature, and the ordinance passed in pursuance thereof, are legal and constitutional.

The true theory of our government we hold to be this, that while Congress possesses no powers except such as are conferred by the constitution of the United States, the State Legislature has all legislative power not inhibited by

---

* The brief of *Mr. Cohen*, properly, should precede the brief *Mr. Durant*.

that instrument, or by the State constitution, or the principles on which our institutions are founded.

The only clause of the latter constitution which it has ever been contended applies to the Act of 1852, is article 123, which requires that "taxation shall be equal and uniform throughout the State."

These words are identical with those contained in Article 127 of the constitution of 1845, under which our Supreme Court decided that a tax imposed by an ordinance on certain enumerated trades and professions, cannot be considered illegal or unconstitutional, because other trades and professions are not taxed. (*Lafayette* v. *Cumming*, 3 Ann. 673; *Duncan* v. *Municipality No.* 2, 2 Ann. 182.)

A mere perusal of Section 1 and 2 of the Act of 1852, No. 175, shows that the tax is equal and uniform throughout the State.

The Supreme Court of Kentucky, in the case of the *City of Louisville* v. *McQuillan's Heirs*, 9 Dana, 516, says, "an exact equalization of the burden of taxation is unattainable and utopian."

· The same Court in the case of *Cheaney* v. *Hooser*, 9 Ben. Monroe, 330, thus meets another objection, which we may anticipate will be raised in our case, viz: as to the power of the legislature to delegate the power of legislation and taxation.

"*Cheaney* v. *Hooser*. The legislature have the constitutional power to confer taxing power upon local corporations, for their government and security."

The objection, that the legislature cannot constitutionally delegate to a local corporation the power of local legislation and taxation for local purposes, is founded upon a misconception of the nature and extent of legislative power granted to the legislative department, and is disproved by the practice of constitutional governments everywhere. It is the legislative power of the commonwealth excluding the power over the constitution itself, that is vested in the legislature, subject only to the restrictions above referred to. That power undoubtedly includes the power of erecting local corporations, to be invested with subordinate powers, essential to the local convenience, and to the enforcement of good order and peace within the corporate territory. A special local taxation, as already intimated, follows justly and naturally, as the correlative of the separate association of the incoporated community for purposes essentially peculiar to itself, and in which the commonwealth at large has only such partial and indirect interest as the whole community is supposed to have in the prosperity and good government of every part. While, therefore, the legislature, as the depository of the general legislative power, may and should, in the erection and regulation of these subordinate governments, which are but instruments for conveniently carrying out the objects of the State government, confer only such powers as are necessary for the local convenience, and limit the powers of taxation so as to prevent unnecessary and oppressive burthens, it seems more convenient and appropriate, and more accordant with the spirit of our institutions and polity, that the power of local regulation and of taxation for local purposes, should be exercised by the local authorities, than by the central government. And although it is true that the legislature cannot constitutionally delegate the general powers of legislation, or any portion of them, yet the power of erecting municipal corporations with powers of local regulations and and taxation, being itself a part of the general legislative power, may be exercised at the discretion of the legislature, without a violation of the constitution or principles of the government. Such acts of legislation have occurred in this State, in instances almost without number, and their validity has been maintained in this Court in many cases, either by tacit recognition or express decision. (*Williamson* v. *Commonwealth*, 4 B. Monroe, 150; *Keasey* v. *City of Louisville*, 4 Dana, 525; *Lexington* v. *McQuillan's Heirs*, 9 Dana; *Tesh* v. *Commonwealth*, 4 Dana, 525; *Louisville* v. *Hyatt*, 2 B. Monroe, 177; *Same* v. *Same*, 5 B. Monroe, 199.)

The principle, that municipal councils and police juries should be empowered to levy a tax on real estate, providing that the ordinance passed should not be binding until approved by a majority of the voters, at a special election called for that purpose, has been resorted to in Ohio, Kentucky, Tennessee, Mississippi, Mobile, &c., with more or less modification. The legality and constitutionality of it were sustained in an elaborate decision in the Supreme Court of Kentucky. *Talbot* v. *Dent*, 9 B. Monroe's Rep., p. 536, 538. 1849. The case decides:

"1. The Legislature have constitutional authority to grant to town corporations power to tax the property of towns or cities for the construction of works of internal improvement, for facility of access to, and transportation to and from the town or city. 8 Leigh's Rep 120. 15 Con. Rep. 475. Ten. Sup. Court. A railroad to a city is such a work.

"2. Taxation by a local corporation for a local purpose, and tending to promote the local prosperity, is within the scope of the corporate power of city corporations, when sanctioned by the legislative authority, though not consented to by each individual to be affected thereby; the will of a *majority* is to govern, when it is referred to the decision of those to be affected."

*Chief Justice Marshall*, in delivering the opinion of the Court, said :

" We pass, then, to the fundamental question, whether the Legislature could constitutionally authorize the public authorities of Louisville, with the consent of a majority of the voters of the city, to subscribe for stock in the Louisville and Frankfort Railroad Company, and to pay for it by increased taxation upon the citizens. And as the right of the Legislature to delegate the power of taxation for local purposes, to the regularly constituted local authorities, is too well established, both by Legislative precedents, and by judicial decisions, to be now denied, and is, in fact, conceded on all sides in the present case, the question stated resolves itself into the inquiry, first: Whether, in the present instance, the power is delegated and exercised for a purpose properly local, or within the legitimate objects of the local corporation ? and, second: Whether, if it be so, any invasion of the constitutional rights of individuals is involved, either in the circumstances under which the power was delegated, or in those which have attended its exercise ?

" Upon the first question, we do not deem it necessary to make any labored argument or discussion. Substantially, the same question has been discussed and decided by the Supreme Courts in the States of Virginia, Connecticut and Tennessee ; and each of these Courts has affirmed the power of the Legislature, in their respective States, to authorize a subscription of stock involving the power of taxation for its payment, by the corporate authorities of a city, under special legislative sanction, for the construction of a work of internal improvement, by which the facility of access and of transportation to and from the city is to be increased. *Goddin* v. *Crump, &c.*, 8 Leigh's Reports, 120. *The city of Bridgeport* v. *the Housatonic Railroad Company*, 15 Connecticut Reports, 475, and *Nichol, &c.* v. *the Corporation of Nashville*, in the Supreme Court of Tennessee, 1849, (pamphlet report.)

The following authorities will be relied on, to show :

1st. That the Act of 1852 is a correct and constitutional exercise of power by the Legislature.

2d. That the ordinance of the Police Jury does not take from the defendant private property without compensation :

  1st. *Goddin* v. *Crump*, 8 Leigh, 120.
     *Flack et al.* v. *Lexington and Mayor, R. R. Company.*
     *American Railroad Journal*, 2d quarto, 9.
     *Nichol et al.* v. *Mayor and Aldermen of Nashville*, 9 Hump. 252.
     *City of Bridgport* v. *Housatonic R. R. Co.*, 15 Conn., 475.
     *James River Co.* v. *Lumer*, 9 Leigh, 325.
     *Thomas* v. *Leland*, 24 Wend. 65.
     *Harrison* v. *Holland*, 3 Grattan, 247.
     *The Inhabitants of Norwich* v. *the County Commissioners of Hampshire*, 13 Pick. 60.
  2d. *Angell on Watercourses*, 40,
     *Thompson* v. *G. G. R. R. & B. Co.*, 3 How. 249.
     *Kent's Com.*, vol. 3., p. 239.
  11, *B. Monroe*, 142.
   9, *B. Monroe*, 526.

SLIDELL, C. J. On the 12th March, 1852, an Act was passed by the legislature of this State, entitled, An act providing for the subscription by the parishes and municipal corporations of the State, to the stock of corporations undertaking works of internal improvement, and for the payment and disposal of the stock so subscribed. It is in these words :

POLICE JURY
*v.*
SUCCESSION OF
MCDONOGH.

"Section 1. Be it enacted by the Senate and House of Representatives of the State of Louisiana in General Assembly convened, That it shall be lawful for the Police Juries and Municipal Corporations of this State to subscribe to the stock of corporations undertaking works of internal improvements, under the laws of the State, on complying with the provisions of this Act.

Section 2. And be it further enacted, &c., That all ordinances passed for such subscriptions, shall contain the following provisions, to wit: 1o. A statement of the number and amount of the shares proposed to be subscribed. 2o. The levy of a tax on the landed estate, situated in the parish or municipal corporation, sufficient to pay the amount of said subscription, and specifying the rate of the taxation and the period or periods when it shall be payable.

Section 3. Be it further enacted, &c., That no ordinance passed under the provisions of this Act shall be valid, or take effect, until it shall have been approved and ratified by a majority of the voters on whose property the tax is proposed to be levied, at an election to be held specially for that purpose, by order of the Police Jury, or municipal corporation, passing the ordinance, and said Police Jury, or municipal corporation, shall prescribe the manner of holding such election, and shall cause to be furnished to the commissioners of the same, a -properly certified list of the authorized voters, and such election shall be preceded by a notice of thirty days, published in one or more newspapers in the parish or municipal corporation where such election shall be held; provided however, that if such ordinance shall be rejected by the majority of the voters, it shall be lawful, at any subsequent period, again to take the sense of the voters, in the same manner as at the first election, and at intervals of not less than six months.

Section 4. Be it further enacted, &c.; That if any subscription be made under the terms of this Act, the stock, so subscribed, shall not belong to, nor be administered by the parish or municipal corporation by which the subscription shall be made, but said stock shall belong to the taxpayers who shall have paid therefor; and the tax receipt of each taxpayer shall entitle him to a certificate, transferable by delivery from the corporation, to which subscription has been made, for an amount equal to the amount of his tax paid; provided, however, that said Police Jury, or municipal corporation, shall be empowered to require such bond and security, and in such sums, from the sheriffs or collectors of said tax, as they may deem necessary."

The present suit is brought by the Police Jury of the Right Bank to collect the amount of the tax assessed on lands within its jurisdiction, to meet its subscription to the stock of the New Orleans, Opelousas and Great Western Railroad Company, under an ordinance, alleged in the petition to have been approved and ratified pursuant to the statute, after an election, and other proceedings in conformity therewith.

The answer of the defendants raised the question of the constitutionality of the statute and ordinance. The parties being desirous to speed the final decision of the cause, signed an agreement that judgment *pro forma* should be entered in favor of the defendants, reserving to the plaintiffs their right of appeal. Under this agreement the cause was submitted in the Court below, and the Court considering the agreement, it was adjudged and decreed, that there be judgment for the defendants, and that the plaintiffs pay the costs of suit. On motion of the plaintiffs, an appeal was ordered on the usual conditions; and

the transcript being returned to this Court, an early hearing was asked, under the statute providing for summary hearing in certain cases.

The argument here has been confined to the question of the constitutionality of the statute and ordinance, which we have considered with the care due to the great public importance of the subject.

The right of the legislature to delegate the power of taxation, for local purposes, to municipal authorities, is established in this State, and in our sister States, by an uninterrupted train of legislative precedents and judicial decisions. The necessity and propriety of such delegation are obvious. The Supreme jurisdiction has not leisure nor information to take cognizance of, and manage, all the matters which concern a particular locality. The interests of a particular town, or county, are best understood, and can be best administered by its inhabitants, or persons of their choice, selected under legislative authority. Our own statute books, and those of our sister States, are filled with Acts creating these political corporations, whose powers are emanations from the legislative will, and subject to be enlarged or curtailed by that will, from time to time, as the wisdom of the legislature may dictate.

But it is said that, in the present case, the legislature has attempted to delegate to municipal bodies a power to tax for a purpose not local; that the constitution intended to confine the raising of money from the people for general purposes, to one body, the General Assembly of the State, and that body cannot evade the performance of the duty and shift the responsibility upon others.

This makes it proper to inquire, what is a local purpose, and how far the particular enterprise which this taxation was intended to aid, could, as regards the municipal corporation which is plaintiff in this cause, be considered as concerning its local interests and welfare.

This question is not a new one. On the contrary, it has been frequently subjected to rigorous judicial investigation, and its answer may be satisfactorily found in the illustrations which are presented in decided cases.

Thus in the case of *Goddin* v. *Crump*, 8 Leigh's Virginia Reports, the improvement of the James and Kenawha rivers was considered, as regards the city of Richmond, a local purpose, by reason of its connection with the commercial prosperity of that city; and, therefore, it was held that the legislature had not violated the constitution of Virginia in authorizing the city of Richmond to subscribe to the James River and Kenawha Company, to borrow money wherewith to make the subscription, and to levy a tax for the purpose of paying the interest and redeeming the principal.

In the consideration of the question, *Tucker*, J. observed: "In the case of water-works, though the same be ten miles off, the Act for introducing the water is fairly a corporate act, because the want is experienced in the heart and through all the wards of the corporation, and the benefit is experienced within the limits, though the operations by which it is introduced are carried on without. So, too, the removal of the bar in James river, above Warwick, would be fairly a corporate act, since it would greatly redound to the advantage of Richmond, would benefit its trade, and diminish the charges which encumber and embarrass it. For though the work would be done beyond the limits of the city, the consequences or effects of it would be felt throughout its borders.

"If then the test of the corporate character of an act is the probable benefit of it to the community within the corporation, who is the proper judge whether

45

POLICE JURY
*v.*
SUCCESSION OF
McDONOGH.

a proposed measure is likely to conduce to the public interest of the city ? Is it this Court, whose avocations little fit it for such enquiries ? Or is it the mass of the people themselves—the majority of the corporation acting (as they must do, if they act at all,) under the sanction of the legislative body ? The latter assuredly."

In the case of *Nichol* v. *The Mayor of Nashville*, the precise purpose in question was considered; and it was held that the legislature of Tennessee had the constitutional power to authorize the corporation of Nashville to take stock in the Nashville and Chattanooga Railroad; that the making of the road was a legitimate corporate purpose of the corportion; and that it was legally authorized to pay for its subscription to the stock of the road, in either of the modes pointed out by the statute.

In the subsequent case of *Talbot* v. *Dent*, 9 B. Monroe, 526, the main question in the cause was, whether the legislature could constitutionally authorize the public authorities of Louisville, with the consent of the majority of the voters of the city, to subscribe for stock in the Louisville and Frankfort Railroad Company, and to pay for it by increased taxation upon the citizens. In the discussion of that question, one of the incidental points of inquiry was, whether in that instance the power was delegated and exercised for a purpose properly local, or within the legitimate objects of the local corporations. The Court considered the point as not requiring any labored argument. Substantially the same question, it said, had been discussed and decided by the Supreme Courts in the States of Virginia, Connecticut and Tennessee; and each of those Courts had affirmed the power of the legislature in their respective States, to authorize a subscription of stock, involving the power of taxation for its payment, by the corporate authorities of a city, under special legislative sanction, for the construction of a work of internal improvement, by which the facility of access, and of transportation to and from the city, is to be increased.

A signal exercise of this legislative power was exhibited in a statute enacted in 1848, authorizing the city of Philadelphia, the county of Allegany, the cities of Pittsburg and Allegany, and the municipal corporations of Philadelphia county, to subscribe for shares of the capital stock of the Pennsylvania Railroad Company, to borrow money to pay therefor, and to pay the principal and interest so borrowed. The exercise of this authority necessarily entailed additional taxation upon the inhabitants of the places designated. Before that statute, the right of a municipal corporation to subscribe for stock was strongly contested. A member of the bar, acting upon the invitation, which was made by this Court to the profession, to afford us assistance in the important constitutional question before us, has favored us with an opinion, prepared with his characteristic ability, by a jurist whose reputation is national. It is an opinion well worthy of perusal by those who desire to know the just limits of municipal power, when not aided by express legislation. But we are told by the Supreme Court of Pennsylvania, that, after the enactment, no one has contested the right of those municipal corporations to subscribe for the stock, and on its faith millions of dollars have been subscribed. See *Commonwealth* v. *Williams*, 1 Jones, 71.

If the decisions cited be true exponents of the law, as we think they are, their application to the present case is obvious. The contemplated Railroad passes through the territorial limits of this corporation, and has one of its *termini* there. If the enterprise is successful, the results which have been

experienced in other towns and sections of the Union, may be realized here. Its facilities of commerce may be enhanced, an impulse to industry within its limits be given, its population be augmented, its lands rise in value. Whether these prosperous results will ensue, is in the womb of the future. But it is evident that the legislature expected them, and it is clear that the Police Jury, and a majority of the voters so thought. The legislature plainly declared such an enterprize to be within the range of their corporate purposes—the Police Jury, acting under the legislative sanction, declared by their ordinance their opinion that the measure would conduce to the interest of their locality, and a majority of the taxpayers have concurred in that opinion. Whether their expectation is false, or well founded, is not, under such a state of legislation, a judicial question. We take it to be a well settled principle, that if the legislature can constitutionally exercise a power, it is to be presumed by the judiciary, in just deference to a co-ordinate branch of the government, that, in the particular case it was exercised discreetly, and with a deliberate and just regard to the interests of its citizens. See the opinion of *Chief Justice Shaw* in *Norwich* v. *The County Commissioners*, 13 Pick. 62.

The peculiar nature of this work certainly can make no difference in the question of constitutional power. A few years ago railroads were unknown. But if the legislature in former years had authorized the construction, by a private corporation, of an ordinary road traversing the States, and had given permission to the Police Juries, through whose territorial limits it passed, to contribute to its completion by taking stock and by local taxation, if they thought it advantageous, we question whether any one in the community would have disputed such a grant of power upon the ground that such a road did not involve a local purpose. Surely the principle cannot be affected by the magnitude of the outlay, the extent of the enterprise, or the peculiar means by which the transportation of persons and property is to be effected. The subject of roads is a matter which, since the foundation of our government, has been submitted, in some form, by the legislature to the action of Police Juries, and this from the obvious consideration of their intimate connection with local wants and local purposes.

The defendants suggest another objection to this tax, which they say is to be found in the articles 108 and 109 of the constitution of 1852. Those articles are as follows: "Art. 108. The State shall not subscribe for the stock of, nor make a loan to, nor pledge its faith for the benefit of any corporation, or joint stock company, created or established for banking purposes, nor for other purposes than those described in the following article.

"Art. 109. The legislature shall have power to grant aid to companies or associations of individuals, formed for the exclusive purpose of making works of internal improvement, wholly or partially within the State, to the extent only of one-fifth of the capital of such companies, by subscription of stock or loan of money, or public bonds, but any aid thus granted shall be paid to the company only in the same proportion as the remainder of the capital shall be actually paid in by the stockholders of the company; and in case of loan, such adequate security shall be required as to the legislature may seem proper. No corporation, or individual association, receiving the aid of the State, as herein provided, shall possess banking or discounting privileges."

The constitution of 1852 was not in existence when the Act of 12th March, 1852, was passed. That Act is not inconsistent with the letter nor the spirit

of the constitution of 1852, and consequently remained in force after its adoption, under the conservative effect of article 143. It is inadmissible to suppose that the Convention, which assembled after the passage of that law and closed its labors on the 31st July, 1852, was ignorant of its provisions. One of the reasons why a change of constitution was desired, as is well known and forms a part of our political history, was the popular wish to disembarrass legislation from some of the trammels of the constitution of 1845. One of them was a prohibition to pledge the faith of the State for the payment of any bonds, bills, or other contracts or obligations for the benefit or use of any person or persons, corporation, or body politic whatsoever. In this respect a grave change was made by the constitution of 1852, whether wisely or imprudently time will determine. The legislature was authorized thereafter to grant State aid to companies or associations formed for the exclusive purpose of making works of internal improvement, wholly or partially within the State. The Opelousas, and the New Orleans, Jackson and Great Northern Railroads were already projected. The subject of internal improvements then occupied intensely the public mind. The people, assembled in Convention, were determined to place it in the power of future legislatures to foster and encourage them ; a power which has since been exercised. It is unreasonable to suppose that the Convention, thus employed in advancing the momentous cause of internal improvement, desired to withdraw aid, already provided in the form of local taxation. Their object, on the contrary, was to originate a further stimulus by State aid, discreetly limiting, however, the extent to which State aid should be furnished. According to sound principles of interpretation, the action of the Convention of 1852 was rather an affirmance than a repeal of the existing law of March 12, 1852.

It is true the statute of 1852, imposes no limit of amount upon the subscriptions of municipal corporations; while the subsequently adopted constitution of 1852 does limit the grant of State aid. But it is clear this difference involves no constitutional repugnancy; and on the score of policy and prudence, there was a reason for limiting the power of the legislature, who were to impose a burden upon the entire population for purposes which might result in unequal advantages to portions of its inhabitants; while in the matter of local taxation, there was a safeguard in a greater identity of interests, and in the control of the vote of the taxpayers.

In concluding our remarks upon this branch of the subject, we desire not to be misunderstood. We would not be considered the advocates of a latitudinarian construction of municipal power in the matter of taxation, which is, perhaps, the greatest function of government in a republican country. We take this case as it is, not a grant of authority to tax, to be deduced from implication, but emanating from an express and unequivocal declaration of the legislative will. See *Stetson* v. *Kempton,* 13 Mass. 283 ; *Parsons* v. *Goshen,* 11 Pick. 398; *Anthony* v. *Inhabitants of Adams,* 1 Metcalf, 287.

Having thus considered the general power of the legislature to delegate to local political corporations the power to levy taxes of this nature, it remains to inquire, whether the conditions with which this grant of power is accompanied vitiate the grant—whether any invasion of the constitutional rights of individuals is involved in the peculiar mode in which the exercise of the power delegated is commanded to take place.

In considering this branch of the subject, we will first examine the objection which is made to the submission of the ordinance to the approval of the tax-payers, in the manner specified in the statute.

Is such a submission really inconsistent, as was suggested at bar, with the genius of our institutions? If the Legislature could constitutionally confer on the Police Jury authority to pass a taxing ordinance, it would seem rather a safeguard against oppression, than the reverse, to qualify the power of requiring it to be exercised with the approbation of a majority of those who are to bear the burden. Certainly, one would be inclined, with much show of reason, to suppose that a system, sanctioned by the legislative will, and tested by a long experience in one of the oldest States in this Union—a State which was amongst the foremost in the struggle for constitutional liberty—could not well be inconsistent with the principles of representative government. If we look to Massachusetts, how do we find municipal matters managed there? If any change is to be introduced into the existing state of things, or if they wish to undertake any new enterprise, the Selectmen are obliged to refer to the source of their power. If, for instance, a school is to be established, the Selectmen convoke the whole body of the electors on a certain day, at an appointed place; they explain the urgency of the case; they give their opinion on the means of satisfying it, on the probable expense, and the site which seems most favorable. The meeting is consulted on these several points; it adopts the principle, marks out the site, votes the rate, and confides the execution of its resolution to the Selectmen. De Tocqueville, p. 65. White's Digest of the laws of Massachusetts, p. 1147.

The system practiced in Massachusetts is not unknown in other States.

Thus, in *Burgess* v. *Pue*, the suit arose in Maryland out of a seizure on execution for school taxes, which had been voted for at a meeting of the taxable inhabitants of a school district. In the statement of the case, and upon which the cause was argued, it was objected that the acts to provide for the public instruction of youth in primary schools throughout the State were unconstitutional and void, because the validity and operation of the same, in any county of the State, was dependant on the votes of a majority of the voters of each county.

The point was made that the acts in question destroyed all accountability for the power of taxation, contrary to the fourth section of the bill of rights, and also that they imposed taxes without the consent of the Legislature, contrary to the twelfth section of the bill of rights.

The remarks of the Court upon these points seem to us equally applicable to the present controversy under our own Constitution. "We think," said the Court, "there was no validity in the constitutional question which was raised by the appellee's counsel in the course of his argument relative to the competency of the Legislature to delegate the power of taxation to the taxable inhabitants, for the purpose of raising a fund for the diffusion of knowledge and the support of primary schools. The object was a laudable one, and there is nothing in the Constitution prohibitory of the delegation of the power of taxation in the mode adopted, to effect the attainment of it. We may say that grants of similar powers to other bodies, for political purposes, have been coeval with the Constitution itself, and that no serious doubts have ever been entertained of their validity. It is, therefore, too late at this day to raise such an objection. The ground of the objection taken in the argument to the constitutionality of the tax, seemed to be that the act of the Legislature delegating the power of taxa-

tion to the taxable inhabitants, was a violation of the fourth and twelfth sections of the bill of rights, the first of which provides 'that all persons invested with the legislative or executive powers of government are the trustees of the public, and, as such, accountable for their conduct,' and the last, 'that no aid, charge, tax, fee or fees, ought to be set, rated or levied under any pretence, without consent of the Legislature.' It is not perceived how the act in question can be deemed a violation of either of those principles of the fundamental law. The tax was certainly levied with the consent of the Legislature, because the power to impose it emanated from the legislative department of the government, and was expressly given by a law passed for that purpose; and there is nothing in it which can be considered as in the slighest degree impairing the responsibility of the law-making power to their constituents for the due and faithful execution of the trust confided to them; because, if deemed to be unwise or inexpedient, an expression of the popular will to that effect was all that was necessary to procure its repeal. 2 Gill's Reports, 19.

So, in Ohio, a tax was resisted as illegal and void which had been assessed by the trustees of a township, upon a vote of the majority of the electors, to meet a subscription for the capital stock of a plank road company, under authority to that effect of an act of the Legislature incorporating the company. For the complaining tax payers, it was insisted, just as here, that the portion of the charter of the company which authorized the trustees of townships to subscribe stocks, upon the vote of a majority of the electors, was opposed to section four of article eight of the Constitution of Ohio, which declares that 'private property ought and shall ever be held inviolate, but always subservient to the public welfare, provided. a compensation, in money, be made to the owner;' that it took from the minority their property without their consent, and without compensation, and also compelled them to become stockholders in a private corporation, and subject to all its burdens. For the respondents, it was contended that the law fell under the taxing power of the Legislature, and was designed to aid the public improvement of a section of the State by local taxation, with the consent of a majority of the people, and it was urged that large sums had been subscribed by the counties, cities and towns of the State, under laws like the one then under discussion, or differing only in the circumstance that in that law the tax-payer had a right, but was not compelled to receive stock for the tax he paid. The resistance of the complainants was unsuccessful; the Court saw no cause for issuing an injunction. Western Law Journal, vol. 7, 220.

Several instances of valid conditional laws are noticed by the Supreme Court of Pennsylvania, in the case of *Parker* v. *the Commonwealth*, 6 Barr, 507, which was cited as an authority in their favor by the counsel for the defendants, but which, if attentively examined, will be found to be the reverse. In that opinion the case of taxes for school purposes was noticed, and the validity of laws on that subject, which subjected the levy to the approbation of the inhabitants of the respective school districts, was expressly recognized. The same remark applies to the case of *Rice* v. *Foster*, 4th Harrington, 495–6. The subject was also noticed by the Pennsylvania Court in 8 Barr, 395, and 10 Barr, 216, in which a strong illustration of the faculty of conditional legislation is cited.

The act of Congress of 9th July, 1846, submitted the question of the retrocession to the State of Virginia, of the county of Alexandria, in the District of Columbia, to a vote of the qualified electors of that county. Virginia had pre-

viously enacted a law signifying her willingness to take back the county, whenever the same should be retroceded by the Congress of the United States. Congress enacted the law of 9th July, 1846, submitting the question to the qualified electors, providing the machinery for the election, and enacting that if a majority of the electors should be against accepting the provisions of the act, it should be void and of no effect; but if a majority of voters should be in favor of accepting, then it should be in full force. And in that event it should be the duty of the President to inform the Governor of Virginia of the result of the election, and that the law was consequently in force. After stating the facts of that case, the Supreme Court of Pennsylvania forcibly remarks: " Many of the most profound constitutional lawyers of the Union were in Congress at that time; and the State of Virginia never hesitated to accept the retrocession, because the Congress of the United States delegated to the people the decision of the question. This act, under all the circumstances, must, therefore, be considered as high authority as a precedent in the development of the constitutional functions of the legislative power." See also the opinion in the case of *Strickland* v. *the Mississippi Central Railroad Company*, recently decided, and in which many of the questions in this case were ably considered.

Several instances of conditional legislation are to be found in our own statute books.

Thus, in 1839, the question of the removal of the seat of justice from the town of St. Francisville, and its establishment at another point in the parish of West Feliciana, was submitted to the vote of the people of the parish. Acts of 1839, p. 53. Similar legislation respecting the parish of Avoyelles will be found in the Acts of 1842, p. 284; respecting the parish of Calcasieu, 1843, p. 88; respecting the parish of Vermillion, 1848, p. 25. See also the Acts respecting the consolidation of the municipalities of New Orleans, Nos. 202 and 241, Acts of 1850.

In conclusion upon this point, we have to say that we find nothing in the statute of 1852 repugnant to the Constitution, or the spirit of representative government; and it seems to us a matter of surprise that the caution of the Legislature, in its grant of the taxing power, should be made a subject of reproach. We think, on the contrary, there was a praiseworthy discretion in thus allowing the voice of the people of the respective parishes to be expressed, instead of authorizing the local authorities to conclude definitively the imposition of a burden for a novel and untried purpose.

It is said that, although the Police Jury might subscribe for stock itself, it could not subscribe for stock for any one of the inhabitants, nor for all the inhabitants in their individual capacities; that the intent and effect of the law is to force individuals to take and pay for stock in a railroad, whether they wish it or not; whether they think the enterprise likely to be beneficial or not; and that such a proceeding is mere spoliation for the benefit of a private corporation.

This reasoning and these assertions misinterpret the purpose of the law, and involve a doctrine subversive of all taxation.

The purpose of the law was to enable political corporations to aid, by taxation, in the completion of public improvements, which, it was supposed by the Legislature, would redound to their local advantage.

The burden imposed was a tax, with regard to which each citizen has not a right to decide authoritatively for himself alone, whether the tax is for a useful purpose, and will redound to his individual advantage. If each citizen can be

permitted to complain that his tax has been increased, without his individual assent, and for a purpose which he individually disapproves, all government would be at an end. The will of a legal majority is not tyranny. It is the good of the community to which we belong which warrants a tax affecting our property. Of this public good, the Legislature, in taxation for general purposes, and the duly constituted local authorities, acting under the express will of the Legislature, in a local sphere, and for local purposes, are the judges. The argument for the defendant confounds two distinct powers, the power of taxation, and the power of taking private property for public use. In the latter case, previous compensation must be made. In the former, though in taking a man's money for taxation you do take his property, the compensation is considered as simultaneously given in the benefit, which, as a citizen, he enjoys in common with his fellow-citizens, in the public welfare and the public prosperity, to the advancement of which the money is to be applied. Such is the theory of taxation. It may be abused; but its exercise cannot be judicially restrained, so long as it is fairly referrable to the taxing power. See *Thomas* v. *Leland,* 24 Wendell, 69, and the opinion of Chief Justice Marshall in the case of the *Providence Bank* v. *Billings,* 4 Peters, 563.

In *Nichols* v. *Mayor, &c., of Nashville,* the controversy arose under an act of the Legislature of Tennessee, by which the Mayor and Aldermen were authorized to subscribe for shares in the Nashville and Chattanooga Railroad Company, the money to be raised from the taxes of the corporation. The Supreme Court of that State observed, if the majority of the corporators be desirous to aid in making the road, and the Legislature will grant them the privilege of doing it, upon what principle shall the minority interfere and prevent it? Minorities are protected against the illegal act of majorities, but they must submit to those which are legal.

The objection made to the law upon the ground that the stock subscribed for by the respective Police Juries is to go to the tax-payers, as provided in section fourth, seems to us untenable. In the understanding of practical men, this is surely no grievance. Its manifest object was to lessen the burden of the tax-payer. If the stock should prove worthless, it imposes no additional burden upon the holder; it involves him in no further responsibility. But if the stock should prove valuable, such value would be so much virtually taken from the burden of the tax. "It is true," as was said by the Supreme Court of Kentucky, in *Talbot* v. *Bent,* in the discussion of the same point, "it is somewhat of an anomaly for the governing power to levy a tax for a particular purpose, and at the same time in a measure reimburse him by a transfer of the thing paid for by the tax; still, if the government were under a valid obligation to pay, and had the right to meet this obligation by a tax upon its citizens, a contribution, rateably assessed and levied for this public object upon all the property of the citizens, would not lose its character of a tax, nor be less obligatory upon individuals, because the payment of it would entitle them respectively to corresponding portions of the thing for which the government had contracted the debt or obligation, for the discharge of which the contribution was required."

We may add that it is a fact, notorious in the recent history of our country, that this principle has been resorted to in many parts of the Union, and was recommended in the railroad conventions which assembled in New Orleans from all parts of the State, before the passage of the law of 1852.

We have thus examined the points which have been presented by the defence. We are of opinion that they are all covered by decisions of the tribunals of our

sister States, the rights of whose citizens are controlled and protected by Constitutions similar to our own. With the assistance of these lights, and of the learned and elaborate arguments of the counsel on both sides, we have applied the test of our own Constitution to the statute of 1852, and the ordinance set forth in the petition, and we are unable to discover any constitutional ground for exempting the defendant from the payment of the tax for which the suit is brought. It is almost superfluous to repeat here a principle which has become an axiom in constitutional law. It is true that if a statute, passed by the Legislature, is not warranted by the powers vested in that body, such act cannot have the force of law, and it is the solemn duty of the Judiciary so to declare it, when an attempt is made through the Judiciary to enforce it. But this is a most grave judicial power, not to be exercised lightly, nor in any case where it cannot be made to appear plainly that the Legislature has exceeded its powers. In just deference to a co-ordinate department of the government, it is always to be presumed that a statute is conformable to the Constitution, and has the force of law, until the contrary is clearly shown.

*Norwich* v. *County of New Hampshire*, 13th Pickering, 61. *The State* v. *the Judge of the Fifth Judicial District.* 5 Annual, 758. *Ogden* v. *Saunders*, 12 Wheaton, 270.

It is, therefore, decreed that the judgment of the District Court be reversed, and that this cause be remanded for further proceedings according to law, the defendant to pay the costs of the appeal.

Ogden, J. A question having been raised as to our jurisdiction over this case, in the form in which it is brought before us, I am requested by the Court to state the views which are entertained by us on that branch of the case. No objection has been raised on this point by the appellees, nor, indeed, could any have been made by them in good faith, as by the agreement entered into under which the *pro forma* judgment was rendered below, the right of the plaintiffs to their appeal was expressly reserved; but the question has been argued by other counsel than those retained in the cause, in printed briefs, which they have thought proper to file. The arguments advanced by them, I am free to admit, did at first strike me as worthy of grave consideration, the question before us being one concerning the constitutional power of a co-ordinate branch of the government. I thought it particularly necessary that we should be clear in our judgment as to a question involving the constitutionality of our own proceeding, in entertaining a jurisdiction said to be in violation of that Constitution. I have, therefore, carefully examined the subject, and I have come to the conclusion that the case is presented to us in a shape in which we are bound to exercise the appellate jurisdiction conferred upon us by the Constitution. The objections urged are, that by the Constitution, our jurisdiction is appellate only, and that by entertaining this appeal from a *pro forma* judgment rendered by agreement in the Court below, we are substantially entertaining original jurisdiction, which is denied to us by the Constitution, and, also, that by law, a party cannot appeal from a judgment confessed by him. It is very evident that this last objection could only be made by the parties to the appeal. In the Supreme Court of the United States, the law is well settled that no appeal, or writ of error can be prosecuted except from a final judgment, and yet they have entertained and decided appeals from interlocutory orders, when no motion was made to dismiss the appeal. The right of appeal to this Court, by the Constitution, extends to all civil cases, when the matter in dispute shall exceed three hun-

46

dred dollars; if the matter in dispute is less than three hundred dollars, con sent of parties would not confer jurisdiction; but where the amount is sufficient, and a judgment has been rendered by a Court from which an appeal lies, the parties may consent to bring the case before us without the observance of all the technical rules prescribed by law, this Court having always the right to insist on the observance of such forms as they may deem requisite for the proper hearing and determining of the cause. The appeal in this cause is taken from a final judgment of an inferior Court, and in a case where the matter in dispute exceeds three hundred dollars, and our jurisdiction is complete, unless it can be made out that we are assuming original jurisdiction. A judgment has certainly been rendered in the Court below which is final in its nature, and, unless reversed on appeal, will be conclusive between the parties. That judgment was rendered in favor of the defendants on their plea that the act of the Legislature, which was the basis of the plaintiffs' action, was unconstitutional and void. The judgment appealed from affirms the validity of that plea, and, in substance, declares the act of the Legislature to be void. The defendant's plea presented a question of law purely; the case was submitted to the Court, and the agreement of the parties to have a *pro forma* judgment rendered, relieved the Judge from the necessity of doing more than to pronounce the judgment, and facilitate the parties in presenting the question involved for final decision in this Court. A party may appeal from a judgment rendered in his favor, and at his own instance, to correct any errors in it; *a fortiori* he may appeal from a judgment rendered against him to correct any errors, although he may have consented to that judgment, unless he has renounced the right of appeal.

Suppose, for instance, that the plaintiffs really believed that the plea set up by the defendant was good in law, and consented to the judgment sustaining the plea, why should he not be allowed his appeal, if he subsequently thought the appeal was bad. The judgment having been rendered with his consent does not make it less a judgment, nor can it be correctly said that this Court, under such circumstances, would render an original judgment when they decided on the appeal. It has been held that a judgment, without reasons, supports the plea of *res judicata*, and is not void until the nullity be pronounced on appeal, or by judgment in the Court which rendered it; and the Court on appeal, in reversing a judgment containing no reasons, will proceed to decide the cause and assign their reasons. See cases of *Legueda* v. *McDonogh*, 6 N. S., 514. *Fulton's heirs* v. *Welsh et al.*, 7 N. S., 257.

The forms of law, in bringing this case before us for the exercise of our appellate jurisdiction, have not been violated. The case has not been brought originally here, nor has any judgment been originally pronounced by this Court. But it is contended that, substantially, we are assuming original jurisdiction, because the judgment below was rendered *pro forma*, by consent of parties, in order to bring the case up more speedily. That such a practice might be so abused as to be liable to this objection, is conceded; but when the parties are acting in good faith, and the case is presented on questions of law alone, arising out of the pleadings, and requiring no evidence or investigation of facts, we do not see that the practice is liable to abuse. It might be desirable to us to have the reasons of the Judge of the first instance, but, in conformity with the practice of the Supreme Courts of other States of the Union, and of the Supreme Court of the United States, we think we may exercise the discretion of entertaining appeals from *pro forma* judgments, rendered by consent in such a case

as this. See case of *Municipality No.* 2 v. *Duncan*, 2d An. R. The constitutionality of an act of the Legislature of the State of the greatest public importance, is drawn in question, and we ought not to shrink from the performance of the duty which is imposed on us, as the highest Court of law in the State, of pronouncing either in favor or against it. *Chief Justice Taney*, in the case of *the United States* v. *Stone*, 14 Peters' R., 524, in speaking of the practice which had obtained in that Court of sending cases before them on a *pro forma* certificate of division of opinion, for the purpose of obtaining the opinion of the Supreme Court, says, the Court do not object to a practice of that description when applied to proper cases, and on proper occasions. It is true, in that particular case, the Court refused to take jurisdiction, and remanded the cause; but the reason was that the Circuit Judge had not been present on the trial in the Court below, and the division of opinion was entered *pro forma* by the District Judge alone exercising Circuit Court jurisdiction. The Chief Justice properly condemned the practice, and uses this language: "A loose practice in this respect might render this Court substantially a Court for the original decision of all causes of importance, when the Constitution and the laws intended to make it altogether appellate in its character, except in the few cases of original jurisdiction enumerated in the Constitution." We have, therefore, the high authority of the practice of that Court whose jurisdiction, like our's, is only appellate, except in certain enumerated cases, for entertaining an appeal from a *pro forma* judgment rendered by consent, in order to obtain the opinion of this Court when the cause is one of importance and difficulty, and we will take care that no loose practice grows up in this respect, from which the evil is apprehended of the Court becoming one of original jurisdiction.