JAMES A. BANET, Appellant, *v.* THE ALTON AND SANGAMON RAILROAD COMPANY, Appellees.

### APPEAL FROM SANGAMON.

A subscriber to railroad stock will be held liable to the payment of his subscription, although the legislature may have authorized and the directors of the company may have adopted a change of route from that first fixed by law, provided the change does not make an improvement of a different character, and his interest is not materially affected by the alteration.

Where the power to require payment from stockholders is vested in a board of directors, an action will not lie to recover instalments, unless all the prerequisites of the charter have been complied with.

THE appellees bring suit to recover of the appellant a certain amount of the appellant's subscription for the stock of the appellees, and file their declaration, setting out that six persons therein named, and their associates, successors, and assigns, were created a body corporate and politic, under the name and style of the Alton and Sangamon Railroad Company; that the plaintiffs were and are the said body corporate and politic, and that on the

Banet *v.* The Alton and Sangamon Railroad Company.

day of        , A. D. 1849, at the county of Sangamon, a subscription book was opened, in pursuance of the charter, which book contained an article in writing in the words and figures following, to wit:

" We, the subscribers to the capital stock of the Alton and Sangamon Railroad Company, each one for himself, in consideration of receiving certificates for shares of the stock of said company, from Simeon Ryder, the president of the board of commissioners authorized to open the books for subscription to said stock, upon which we have paid five dollars on each share, which number of shares have been hereinafter subscribed by each of us, do hereby agree, in consideration of having received such certificates for shares of stock, and in consideration of being one of said stockholders by subscribing therefor, to pay the balance of the instalments due on stock by us subscribed, when the same may be called for by the board of directors of said company, when duly organized in conformity with the charter approved Feb. 27th, 1847." And that on the terms and conditions of said article, in writing, the defendant subscribed in said book for thirty shares of said stock, and there and then paid five dollars on each share so subscribed for, and there and then received a certificate, as in said article mentioned. That on the day of        A. D., eighteen hundred and        , said body corporate and politic, became and was duly organized, in pursuance of said act, and afterwards and before bringing suit the defendant was required and notified by the directors of said company, to pay to said company for three instalments on his subscription for stock, the sums and at the time following, that is to say, $150 on the 28th day of June, 1850; $150 on the 24th day of August, 1850; $150 on the 24th day of September, 1850; $300 on the 24th day of October, 1850; $300 on the 10th day of December, 1850, and $300 on the 11th day of February, 1851, by means whereof the defendant became liable to pay to the said plaintiffs the several sums of money aforesaid, and being so liable, promised, &c.

And the declaration further counts on the promise in writing aforesaid of the said defendant, averring an organization in conformity with the charter of said company, and that on the

day of        1852, certain instalments due on said stock of said defendant, had been called for by the board of directors of said company, amounting to the sum of $13.50, of which defendant had due notice by means whereof defendant became liable, promised, &c.

And the declaration further counts on the indebtedness of said defendant, for divers calls on the thirty shares subscribed for by said defendant, said calls being duly made by the board of directors, and being so indebted, the said defendant promised, &c.

The defendant filed his pleas, non assumpsit, and no such corporation.

Replication and trial by the court. Exemplified copy of charter in evidence.

A judgment was rendered *pro formâ*, by DAVIS, Judge, at the November term, 1851, of the Sangamon Circuit Court, for $1,351, and Banet appealed.

S. T. LOGAN and E. B. HERNDON, for appellant.

A. LINCOLN, for the appellee.

TREAT, C. J.   On the 27th of February, 1847, the legislature passed " An act to construct a railroad from Alton, in Madison county, to Springfield, in Sangamon county." The 1st section provides, " that Robert Ferguson, Simeon Ryder, Benjamin Godfrey, Thomas Clifford, Robert Dunlap, and William Martin, and their associates, successors, and assigns, are hereby created a body corporate and politic, under the name and style of ' The Alton and Sangamon Railroad Company,' for the term of thirty years, and by that name be, and they are hereby, made capable in law and in equity to sue and be sued, plead and be impleaded, defend and be defended, in any court of law and equity in this State, or in any other place, to make, have, and use a common seal, and the same to renew and alter at pleasure, and shall be, and are hereby, vested with all the powers, privileges, and immunities which are or may be necessary to carry into effect the purposes and objects of this act as hereinafter set forth; and the said company are

hereby authorized and empowed to locate, construct, and finally complete a railroad from the city of Alton, on the Mississippi River, in Madison county, by the way of Carlinville in Macoupin county, New Berlin in Sangamon county, to the city of Springfield, in the county of Sangamon." The 2d section provides, that " the capital stock of said company shall consist of five hundred thousand dollars, and may be increased to one million of dollars, to be divided into shares of one hundred dollars each; " and that the government of the company shall be vested in five directors, to be elected annually, one of whom shall be chosen president of the company. The 6th section appoints the persons named in the 1st section commissioners to open books for the subscription of the capital stock, and requires them to keep the same open until the whole shall be taken. It further provides, that they " shall require each subscriber to pay five dollars on each share subscribed at the time of subscribing. The said commissioners shall call a meeting of the stockholders, by giving thirty days' notice in some newspaper printed in the county of Madison, and at such meeting it shall be lawful to elect directors of said company; and when the directors of said company are chosen, the said commissioners shall deliver said subscription-books, with all sums of money received by them as commissioners, to said directors." The 14th section declares, " that it shall be lawful for the directors to require payment of the sums subscribed to the capital stock, at such times and in such proportions and on such conditions as they shall deem fit, under the penalty of the forfeiture of all previous payments thereon; and shall give notice of the payments thus required, and of the place and time when and where the same are to be paid, at least ninety days previous to the payment of the same, in some public newspaper of this State, published in some one of the cities where the notice for the opening of the books for subscription to the capital stock may have been published."

The commissioners met at Alton in March, 1847, and organized, by electing a president, secretary, and treasurer. Notice was regularly given of the opening of the books for the subscription of the capital stock. Books were opened in Springfield in 1849, under the direction of the commissioners. James A.

Banet subscribed for thirty shares of the stock, paid the five per cent. required by the charter, and received a certificate of stock from the commissioners. Although a resident of Springfield, he was largely interested in real estate situated in the immediate vicinity of New Berlin, the value of which would be much enhanced by the construction of the road through that place.

On the 3d of January, 1850, the commissioners declared that the whole amount of the capital stock had been subscribed, and the five per cent. required by the charter paid thereon; and they ordered an election for directors to be held at Alton on the 6th of February, 1850, due notice of which was given. At a meeting of the commissioners on the 31st of January, 1850, the subscription list was found to embrace five thousand and sixty-eight shares of voting stock. Five directors were elected on the 6th of February, 1850, to whom the commissioners transferred the books of subscription, and the moneys arising from the first payment on the stock, with the exception of certain sums expended by the commissioners for surveys, services of agents, &c.

Between this time and the 11th of February, 1851, six instalments on the stock, amounting in the aggregate to forty-five dollars per share, were required to be paid at the office of the treasurer of the company in Alton. The notices of the calls were signed by the president of the company, and regularly published in the Alton and Springfield newspapers. The directors kept their office and held their meetings in the city of New York. It appears, from the minutes of the board, that the directors, from time to time, authorized these calls on the stockholders. In two instances, the president was directed to call for an instalment of five or ten dollars per share, as he should deem advisable; in other instances, the time when an instalment was to be paid was left discretionary with the president.

On the 29th of January, 1851, the legislature passed an amendatory act, authorizing the company to change the location of the road, so as to run the same direct from Carlinville to Springfield. The board of directors accepted the provisions of the act, and changed the route of the road accordingly. By this change, the line of the road is shortened about twelve miles, and

the aggregate cost of construction considerably lessened. As now located, the road does not run within twelve miles of New Berlin. Banet actively opposed the passage of the law and the change in the route of the road. The alteration was generally desired by the stockholders.

On the 22d of February, 1851, the corporation brought an action of assumpsit against Banet, to recover the sum of $1,350, the amount of the six instalments due on his stock on the 11th of February, 1851, according to the calls made by order of the directors. He pleaded non assumpsit and *nul tiel* corporation. And, on the state of facts above set forth, the court rendered a judgment, in favor of the corporation, for the sum demanded. The defendant prosecuted an appeal. Two questions arise in the case.

*First.* Did the alteration in the charter exonerate the defendant from the payment of his subscription? In the solution of this question, the special reasons which may have influenced him to become a subscriber to the stock of the company, cannot be taken into consideration. It is not pretended, that he was induced by fraud or misrepresentation to enter into the engagement. His contract was voluntarily made, and it is absolute in its terms. It would not even be competent to show, that it was designed to be a conditional undertaking. The written contract must be its own interpreter. He agreed, in consideration of becoming the owner of thirty shares of the stock, to pay three thousand dollars, at such times and in such proportions as the board of directors should prescribe. The motives by which he was actuated are not the proper subject-matter of inquiry. For the purpose of determining the question of his liability, it is wholly immaterial whether he became a subscriber because he believed that the stock would of itself be a profitable investment, or because of the incidental benefit which he might receive from the construction of the road in the immediate vicinity of his lands. It was decided, in the case of Irvin *v.* The Turnpike Company, 2 Penrose & Watts, 466, that the benefit which results to individual property, by the incorporation of a company and the location of a public road, does not, in contemplation of law, enter into the consideration of the con-

43*

tract of subscription to the stock of the corporation; and that such subscriptions are made subject to the power of the legislature to change the location of the road, where the contrary is not expressly stipulated. The rule, in relation to contracts of this character, must be general in its operation. What will discharge one stockholder from the payment of his subscription, must be held to have the same effect as to others. If the defendant is to be relieved from the performance of his obligation because of the change in the route of the road, so must any other subscriber, although it should clearly appear that his interests would be promoted by the alteration. The matter of injury to one, or of benefit to the other, cannot affect their respective liabilities. The true question, then, is, not whether the defendant was deprived of any incidental benefit by the change in the location of the road, but whether the amendment of the charter worked such a change in the company as releases the subscribers from their engagements, at least such of them as have not assented to the alteration. A reference to the authorities bearing on this subject will not be inappropriate. In The Middlesex Turnpike Corporation v. Lock, (8 Massachusetts, 268, and the Same v. Swan, 10 Id. 384,) it was decided that a subscription to build a turnpike in a specified direction could not be recovered to construct a road in a different direction, although the change was authorized by the legislature, and assented to by the directors of the corporation. In The Proprietors v. Towne, (1 New Hamp. 44,) a subscriber was held to be excused from the payment of his subscription on the ground that the corporation had obtained an amendment of the charter, that materially changed the objects and character of the company. The Hartford and New Haven Railroad Company v. Croswell, (5 Hill, 383,) is a leading case on this subject. In that case, in 1833, the legislature of Connecticut incorporated a company to construct a railroad from Hartford to New Haven, and Croswell subscribed for ten shares of the capital stock. In 1839, the legislature authorized the company to procure and run a line of steamboats in connection with their road, and, for that purpose, to increase their capital stock to an amount not exceeding two hundred thousand dollars. The amendment was ac-

cepted by the board of directors, and ratified by a majority of the stockholders. The corporation then brought an action against Croswell, to recover the amount of his subscription. The court held that the subscription could not be recovered, on the ground that the amendment to the charter effected an essential change in the company, — the addition of a new and different enterprise. In Clark v. The Monongahela Navigation Company, (10 Watts, 364,) and Gray v. the Same, (2 Watts & Serg. 156,) it was held that an alteration in the charter of an incorporation, by which additional privileges were granted to the company, was not such an invasion of the contracts of subscription as would relieve the subscribers from their liability to pay; although the additional privileges might extend the liabilities of the company, and thereby affect the stockholders. In The Pennsylvania and Ohio Canal Company v. Webb, (9 Ohio, 136,) the court say : " It is not every minute change which will absolve a subscriber from his engagements. In works of this kind, some power of regulation is retained by the legislature ; some discretion is confided to the agents who execute the details. Where the subscription is general, unincumbered with conditions, perhaps the stockholder has no reason to complain of any line of transit, which starts from the same point of business, accommodates the same travel and transportation, and substantially subserves the same general interests." The cases of Wain v. The Turnpike Company, before cited, London and Brighton Railway v. Wilson & Fairclough, (6 Bingham's New Cases, 135,) and Midland Railway Company v. Gorden, (16 Meeson & Welsby, 804,) recognize the same principles.

It follows, from these authorities, that an alteration in a charter may be so extensive as to work a dissolution of the contract of subscription. An amendment, which essentially changes the nature or objects of a corporation, will not be binding on the stockholders. A corporation formed for the purpose of constructing a railroad, cannot be converted into a company to construct an improvement of a different character, without the consent of all the corporators. A road intended to secure the advantages of a particular line of travel and transportation, cannot be so changed as to defeat that general object. The corporation must

remain substantially the same, and be designed to accomplish the same general purposes, and subserve the same general interests. But such amendments of the charter as may be considered useful to the public, and beneficial to the corporation, and which will not divert its property to new and different purposes, may be made without absolving the subscribers from their engagements. The straightening of the line of the road, the location of a bridge at a different place on a stream, or a deviation in the route from an intermediate point, will not have the effect to destroy or impair the contract between the corporation and the subscribers. We regard these conclusions as reasonable and just, and as well calculated to facilitate the construction of improvements, and promote the best interests of the public and of stockholders. The incidental benefits which a few subscribers may realize from a particular location, ought not to interfere with the general interests of the public, and of the great mass of the corporators. These interests of the public and of the corporation may with propriety be consulted and encouraged, especially where the alteration will not operate to depreciate the value of the stock. A shareholder has no cause to complain of the loss of a mere incidental benefit, which formed no part of the consideration of his contract of subscription. The difficulties attending the construction of a public improvement may not be fully known, when the charter is granted and the stock subscribed. The legislature possesses the power to provide a remedy, by authorizing the company to adopt a more feasible route, without obtaining the consent of all the corporators. A few obstinate stockholders should not be permitted to deprive the public and the company of the advantages that will result from a superior and less expensive route. The subscribers are sufficiently protected against any invasion of their legitimate rights. The original location must be pursued, unless a change is sanctioned by the legislature. The alteration must be accepted by the managers of the company, before it becomes obligatory on the stockholders. And the latter will not even then be bound, if their interests are materially affected by the alteration; and in such case, they may not only avoid the payment of their subscriptions, but recover back such sums as they have advanced thereon.

The alteration in the present case is not of such a radical character, as to exonerate the stockholders from the payment of their subscriptions.    The general features and objects of the corporation continue unchanged.    The *termini* of the road remain the same; the only change consisting in a deviation from an intermediate point.    The work is still designed to accommodate the same line of travel and transportation, and promote the same general interests.    The length of the road is reduced, and the cost of construction diminished.    The change will be useful to the public, as the legislature has determined, and beneficial to the company, as the board of directors has decided; and the facts of the case clearly sustain both of these conclusions.    The only injury that can accrue to any of the subscribers, will be the loss of some incidental benefit to their property; and that, as we have already seen, cannot be taken into consideration.    If the charter had been so amended as to authorize the construction of a road from Alton to Vandalia or Shelbyville, or from Springfield to Beardstown or Peoria, instead of the one originally designated, the company would be committed to a new and difficult enterprise; and the stockholders might with much force and justice say, this is not the undertaking in which we engaged, and not the stock in which we agreed to invest our funds.

*Second.* Were the calls legally made?  The power to require payment from the stockholders, is by the charter vested in the board of directors.    No action can be maintained against a stockholder for an instalment on his subscription, until the board has directed the call to be made, and due notice of the amount, and the time and place of payment have been given.    The subscribers are in no default, until these prerequisites of the charter have been performed.    A call by the president, without the sanction of the board, would not be binding on the subscribers.    The notice may properly be given by him, but it must be founded on the action of the directors.    The calls in question were authorized by the directors, and were made substantially in pursuance of the provisions of the charter.    The fact that the board authorized the president to determine the amount of some of the instalments, and to designate the times of payment, cannot be regarded as such a delegation of authority, as to render the calls invalid.

The calls were based on the instructions of the directors, and must be considered as proceeding from them. They were virtually the acts of the board, and not those of its president.

The judgment is affirmed.

*Judgment affirmed.*