THE CITY OF SAN ANTONIO v. ENOCH JONES.

See this case for an affidavit held to have satisfactorily explained the delay in transmitting the papers in a cause to the county to which the venue had been changed. (Paschal's Dig., Arts. 1416, 1417, Notes 530, 531.)

A motion for a change of venue is addressed mainly to the discretion of the judge of the district court.

His judgment on such a motion will not be reversed, unless it appear that injustice has been done, or that some principle has been violated, although a different conclusion upon the facts presented might have been equally satisfactory to the appellate court, if the question had been presented as an original one for its determination. (Id.)

See this case for the provisions of a charter, authorizing the city of San Antonio to become a stockholder in the corporation, held to be constitutional.

The general question of legislative power to authorize municipal corporations to subscribe for stock in railroad companies, to borrow money on the faith and credit of the corporation, to pay subscriptions, and to levy taxes to pay for loans, discussed, and authorities cited at length, and the conclusion arrived at, that the courts of the last resort have almost uniformly sustained the constitutionality of such laws.

The case of State v. Swisher, 17 Tex., 44, cited, and held, that the question therein decided was correctly and conclusively settled.

The charter of the San Antonio and Mexican Gulf Railroad Company, authorizing the mayor and aldermen to submit to the qualified voters thereof the

question, whether the city should subscribe for stock, did not thereby confer upon the city legislative powers. (Paschal's Dig., Note 65.)

Nor is a statute, the complete execution of which is, by its provisions, made to depend on the assent of some other body, a delegation of legislative power.

The provisions of a railroad charter, requiring that a certain section of the road shall be completed within a specified time, and that, on failure, the charter should be null and void, is not of the essence of the contract between the corporation and stockholders.

Amendatory acts, by which the time for completing a railroad is extended and enlarged, are for the benefit of the corporation, and they are presumed to have been passed for the benefit of the stockholders.

APPEAL from Guadaloupe. The case was tried before Hon. A. W. TERRELL, one of the district judges.

San Antonio has a history extending through various bloody revolutions as well as a judicial history. According to Mr. Justice LIPSCOMB, in the case of Lewis v. San Antonio, 7 Tex., 250, it was founded in the year 1717, by Spaniards, who came from the Canary Islands. These inhabitants established missions, civilized the Indians, and laid out a city, which became the centre of empire in Texas. To this city the king of Spain gave a charter and a grant of lands, called *exidos*. These lands, as will be seen in the case above referred to, long afterwards became the subject of litigation, but they were confirmed to the city to the extent of seven leagues by act of congress and judicial decision.

San Antonio had its venerable churches of Valere and of the Alamo, whose tragical history is associated with the independence of the republic of Texas. The Alamo was secularized, and the title to this historic property became a subject of litigation between the ancient city and the fathers of the Catholic Church. (See San Antonio v. Odin, 15 Tex., 539.)

This is one of the Texas cases which serves as a landmark in the history of the doctrine of revolutions upon private property and the relations of government to churches and people; and in it is announced one of the cardinal

principles of civil liberty, by which the Roman Catholic Church was reduced from the high privilege of being the only national church to a level and an equality with every other denomination of religion; and that by the successful revolution of 1836 the vast church property of Texas passed from the Catholic order to the infant republic.

According to the laws of Spain, the government of the city of San Antonio was in an *Ayuntamiento*, which was a civil corporation, with very extensive powers over the inhabitants and the common property. It was presided over by an *Alcalde*, whose political powers extended to many of the offices of a local governor. The records of this government, called archives, possess very great interest, and have been the subject of considerable legislation in Texas. (Paschal's Dig., Arts. 83–86.)

San Antonio, like other cities, had its *plazas* or squares devoted to pleasure, convenience, and military parades. These have been held to be irrevocable dedications to public use, appurtenances which entered into the deed of every purchaser of a city lot, and that the combined power of the *Ayuntamiento* and the Spanish governor, who represented the powers of the viceroy, could not revoke. (San Lewis v. Antonio, 15 Tex., 391; Lewis v. San Antonio, 26 Tex., 316.)

The authorities of San Antonio expended much money and labor in the worthy example of establishing irrigation, and thus promoting the interests of agriculture to an extent which the North Americans have not learned to imitate. The history of these improvements, and the ancient rights claimed under them, will be found in the case of Rhodes v. Whitehead, 27 Tex.; 304.

We come now to a new period in the history of San Antonio litigation. It grows out of modern civilization. By sundry acts of the republic of Texas San Antonio was incorporated, and to the common council was given the right of limited legislation. (See Law Rep., vol. 2, p.

37, secs. 1, 3, 8; Id., vol. 3, p. 29; Id., vol. 6, p. 32, secs. 2, 8.)

By this last act of 14th February, 1842, the right to vote is limited to such of the inhabitants as are the holders of real estate.   And by one of the other acts, which grants to the city of San Antonio the *exidos* (or town commons) the use of that public property is confined to certain public improvements and education.   (See also Lewis v. City of San Antonio, 7 Tex., 250.)

The constitution of 1845, upon which Texas was admitted into the Union, extended the right of suffrage to every free male person who shall have attained the age of twenty-one years, who shall be a citizen of the United States, &c., (Indians, not taxed, and Africans excepted.)  Whether the constitution overrode the city charter of San Antonio of 1842, and extended the elective franchise to *all* citizens of San Antonio, at all elections, is a question which was not raised in this case, but it has been raised in other cases involving the same bonds, in which other cases the city insists that an election which confined the right of voting to property-holders was not binding upon the inhabitants who owned no real estate, and were, by the Mayor's proclamation, excluded from the polls.

Annexation brought great prosperity to San Antonio, as it did to the great State of Texas.   The Mexican war and the defense of the frontier made it a great military centre.   It became the headquarters of the army and the entre-pot of a large Mexican trade.   North Americans and Europeans were attracted to the old city by its commercial advantages.   Stone palaces took the places of Mexican *jacales* and old fort-like stone houses.

But San Antonio is one hundred and sixty miles above the Gulf of Mexico, and its carrying, to the disgrace of its inhabitants, has been almost exclusively confined to its thousand Mexican *carteros*.

On the 5th day of September, 1850, the legislature

passed "An act to incorporate the San Antonio Railroad Company." The title was afterwards changed to the "San Antonio and Mexican Gulf Railroad Company." Among others, a very liberal rule of offsetting benefits against damages was enacted. This section was carried into other charters, and has been held to be in part unconstitutional. (See Buffalo Bayou and Brazos Railroad Company v. Ferris, 26 Tex., 588; Paschal's Dig., Note 168, p. 49.)

The sections of this railroad charter which bear immediately upon this controversy are copied into the subsequent history of this case. Under the 12th section of the act, a majority of the voters of the city, who did vote at a regular election for city officers, agreed that the city should subscribe for $50,000 worth of railroad stock, and to pay for it, should issue its bonds, with coupons for interest, at twenty years. The bonds were issued. Enoch Jones became the first president of the road. A survey was made; a contract was let to Enoch Jones and Thomas J. Devine to build the road. It was not built within the time prescribed by the charter. The time was extended by subsequent legislatures. A few of the interest coupons were paid; but, because of the failure to build, the corporate authorities finally repudiated the bonds, and undertook the business of defending against the payment.

And now, more in the language of a law reporter, this suit was originally brought in the county of Bexar, on the 31st August, 1857.

The appellee, Enoch Jones, sued the city of San Antonio upon twelve due-bills or coupons, of one of which the following is a copy, to wit:

"CITY OF SAN ANTONIO BONDS.

"Due from the city of San Antonio to bearer $35 for six months' interest, due 1st September, upon bond No. ——, for $1,000.          C. F. KING, *Mayor*."

Also upon twenty-two coupons, of $17 50 each, of the

same date, for six months' interest on bonds for $500 each, all drawn of like tenor and effect as the above.

The defendants plead generally, and answered specially, that "the coupons were given to the San Antonio and Mexican Gulf Railroad Company, for interest on certain bonds executed to said company for a subscription for stock under and by virtue of an act of the Legislature of the State of Texas, entitled 'An act to incorporate the San Antonio Railroad Company,' approved September 5, 1850; that the authority therein contained to make said subscription and to execute said bonds and coupons, is unconstitutional and void; that, in making said subscription, time was of the essence of the contract; that the charter of said company provides, that if said railway is not commenced within one year from the 1st of November, 1850, and if at least twenty miles are not in running order within three years from its commencement, then this charter shall be null and void; that defendant was induced to subscribe for stock on account of the stipulations and limitations contained in said section of the charter, and was and is still considered a part of the contract; that said railway was not commenced at the time required by said charter, nor has the number of miles therein stipulated been completed; and, although the said company have from year to year required defendant to pay the interest on said bonds, to pay the stock subscribed for, and for which said bonds were executed, they have not completed any considerable portion of said railway, nor can they give any assurances that it will ever be constructed, although a period of seven years has elapsed since they obligated themselves to commence the same: therefore the considerations for which said coupons were executed has wholly failed. All of which was well known to the plaintiff at the time of obtaining the same."

On motion of plaintiff, there was an order for a change of venue to Guadaloupe county, made on the 6th day of

October, 1857, but the papers were not sent as required by statute. The defendant, on the 24th day of November, 1858, moved to dismiss the cause, because more than two terms of the District Court of Guadaloupe county had intervened between the time of granting the order for a change of venue in Bexar county and the time of filing the transcript and papers in the District Court of Guadaloupe county.

To resist this motion, the following answer, sworn to by I. A. Paschal, counsel for plaintiff, was filed:

"In answer to the motion, to dismiss in the above-entitled cause, I. A. Paschal, one of the counsel of plaintiff, being duly sworn, says: That it was agreed and understood between R. H. Howard, and after motion to change was made, that said cause should stand over till the spring term, 1858, of the district court, when it was believed that Judge Devine would exchange circuits with some other judge, who could try causes in which he was interested. That said Howard was then acting as one of the counsel for said city, and put the case to issue after the order for the change of venue. That at the spring term, 1858, affiant labored under the belief that the papers were still before the court, when Judge Terrell took the bench; but, on inquiry of the clerk of the district court, affiant was informed that the papers had gone to Guadaloupe under the order of transfer. Affiant came to Guadaloupe court and found that they had not been sent, nor was affiant able to procure the papers till six or eight days before the beginning of the present term of the court."

The motion to dismiss was overruled, and the papers sent to Guadaloupe.

The sections of the charter, referred to in the opinion of the court, of the San Antonio and Mexican Gulf Railroad Company, are the following, to wit:

"Sec. 12. The mayor and aldermen of the city of San Antonio be, and they are hereby, authorized to sub-

scribe to the capital stock of said company for said city to an amount not to exceed $50,000, as also such incorporated towns through which such railway may pass, inclusive of the town, if any, that may be its terminus on the gulf, and to issue bonds bearing interest, or otherwise to pledge the faith of said city or towns to pay for same. The chief justice and county commissioners of the several counties through which the railway may pass shall be, and they are hereby, authorized to subscribe to the capital stock of said company for their respective counties to an amount not to exceed $50,000, and to issue bonds bearing interest, or otherwise to pledge the faith of their respective counties to pay the same: *Provided*, That the chief justice and county commissioners of said counties shall not make such subscriptions unless two-thirds of the qualified electors of said county or counties, at an election to be held for that purpose, shall vote in favor of such subscription being made; and the chief justice of any such counties may order such elections to be held, and shall give notice of the time and object of such elections, by causing notice thereof to be posted up in each precinct of the county at least thirty days before the holding of such election; said election to be conducted in the manner regulating county elections, so far as the same may be applicable: *Provided, also,* That the said mayor and aldermen of the city of San Antonio, and the towns upon the line and at the terminus of said railway on the Gulf, shall not make such subscriptions unless two-thirds of the electors of said city or towns, qualified to vote for town or city officers at an election to be held for that purpose, shall vote in favor of such subscription being made; and said elections shall be conducted in the same manner regulating the respective city or town elections, so far as the same may be applicable: *Provided, further,* That where any such subscriptions shall be made and bonds thereof issued by the mayor and aldermen of any of

said towns or city, or by the chief justice of any of said counties, it shall be their duty, respectively, to provide for the punctual payment of the interest that may from time to time become due upon the same, and for the payment of the principal thereof, by levying and collecting a tax on the real and personal property in the city, town, or county for which said subscription shall be made and bonds issued, which tax shall not be less than ten cents nor more than fifty cents on each and every $100 of taxable property in said city, town, or county, and shall be assessed, and collected, and paid into the treasury of said city, towns, or counties, by which it is levied, in the same manner the city or county tax in such city, or towns, or counties, is assessed and collected; which tax shall be continued from year to year, until the whole amount of principal and interest due on said bonds shall have been fully paid and discharged, and, when collected, after deducting therefrom the expenses of assessing and collecting, shall first be applied to the payment of the interest due on such bonds, and the remainder shall be applied to the payment of the principal of such bonds."

"Sec. 18. If said railway is not commenced within one year from the 1st of November, 1850, and if at least twenty miles are not in running order within three years from its commencement, then the charter shall be null and void.

"Approved September 5, 1850."

An act entitled, "An act to revive and continue in force, and supplementary and amendatory" of said charter, provided:

"Sec. 1. That an act entitled, 'An act to incorporate the San Antonio and Mexican Gulf Railroad Company,' approved September 5, 1850, and the several supplementary and amendatory acts concerning said railroad, be, and the same are hereby, revived and continued in force, in accordance with the provisions of said original act and acts sup-

plementary and amendatory thereto, and on the terms and conditions hereinafter mentioned: *Provided*, That the act of revival shall not be so construed as to render liable any person or persons for the payment of any unpaid balance, who would not have been liable without the passage of this act.

"SEC. 2. That the 18th section of the act entitled, 'An act to incorporate the San Antonio and Mexican Gulf Railroad Company,' approved September 5, 1850, be so amended, that the same shall hereafter read as follows, to wit: 'That at least twenty-five miles of said railroad shall be completed in running order by the 1st day of January, 1860, otherwise this charter shall be null and void.'"

On the trial, it was admitted that an election was held, in accordance with the terms of the 12th section of the charter, on the last Monday of December, 1850, and that at San Antonio two-thirds of the qualified voters of that city voted in favor of taking $50,000 of the capital stock of said road; that thereupon the bonds to that amount, and the coupons in controversy, were signed and delivered to said company by C. F. King, the mayor of the city. It was agreed that no part of the road was completed in accordance with section 18 of the original charter; nor any part thereof to the date of the trial, except five miles and one-half had been completed, and only thirty miles had been graded; but that the whole route had been surveyed, and the plans and specifications made, and the right of way secured on most of the route in the year 1853.

It was also admitted that the city had never demanded nor received its certificates of stock, though the same had been duly signed, and had remained in the office subject to the call of the city. It was further admitted, that Enoch Jones, the plaintiff, was president of the railroad until 1853, and was fully cognizant of all its affairs at the time of purchasing the coupons; that the city assessed and collected the tax for the year 1852 to pay the coupons; that the city

also assessed and collected part of the tax for 1853 for the same purpose; that the mayor and aldermen, elected in 1853, passed resolutions forbidding the collection of the balance of the tax for 1853 and the railroad tax for 1854, and that no tax was assessed for the years 1855, 1856, and 1857; that the city assessed a special railroad tax for 1858; that but a small part thereof had been collected, by reason of the refusal of the people to pay the same; that there is a resolution of the city corporation authorizing the receipt of all coupons in city dues, passed in November, 1857.

It was further admitted, that no election was held to approve or disapprove of the extension of time by the legislature on the part of the voters of San Antonio since December, 1850. The coupons declared on were read in evidence.

A jury was waived, and cause submitted to the court. There was a judgment for plaintiff, and defendant appealed.

*W. B. Leigh*, for the appellant.

*I. A. & Geo. W. Paschal*, for the appellee.

MOORE, C. J.—The delay in transmitting the papers to the District Court of Guadaloupe county, in obedience to the order changing the venue, is satisfactorily explained by the affidavit of appellee's counsel.

The motion is of a character which addresses itself mainly to the discretion of the judge to whom it is presented. Unless it is apparent that injustice has been done the appellant by the district court in the exercise of this discretion, or some legal principle has been violated, this court does not feel called upon to reverse the judgment, although a different conclusion, upon the facts presented in the record, might have been equally satisfactory to our minds, if the question had been presented as an original one for our determination.

It is alleged, in the amended answer of the appellant, that so much of the act incorporating the San Antonio and Mexican Gulf Railroad Company as authorized the city of San Antonio to become a stockholder in the corporation thereby created is unconstitutional and void. The general question of legislative power, to authorize municipal corporations to subscribe for stock in railroad companies, to borrow money on the faith and credit of the corporation, to pay the subscriptions, and to levy taxes to pay the loans, has been most elaborately discussed during the past few years in the courts of almost every State in the American Union. The constitutional provisions of the different States, in which the question has been adjudicated, are not believed to be materially dissimilar from our own. Yet, while the policy of such laws has been very generally questioned, and strong and cogent dissenting opinions have been expressed by many of the ablest jurists of the country, the courts of last resort have almost uniformly sustained the constitutionality of such laws. So unbroken has been the general current of decision, that it has been said by the well-known elementary writer and distinguished jurist Judge Redfield, though evidently himself inclining to a different opinion, (if the question were one of the first impression,) "That it is now too late to bring the matter into serious debate, certainly until a larger experience of the impediments attending the management of investments in railway companies by municipal corporations." (Red. on Rail., 535 *n*.) So far as we may judge from later decisions, the "larger experience," to which test this eminent judge has referred the question, has by no means tended to lessen the force of previous authority, which, as he says, was of too much weight to leave the point open for "serious debate." (See City of Bridgeport v. Housatonic R. R. Co., 15 Conn., 475; Goddin v. Crump, 8 Leigh, 120; Sharpless v. Mayor of Philadelphia, 21 Penn., 147; Moes v. City of Reading, Id., 188;

C. W. & Z. R. R. Co. v. Commissioners of Clinton County, 1 Ohio, 77; Steubenville & Indiana R. R. Co. v. Trustees of North Township, Id., 105; Griffith v. Commissioners of Crawford County, 20 Ohio, 622; Talbot v. Dent, 9 B. Monr., 526; Slack v. Maysville & Lexington R. R. Co., 13 B. Monr., 1; Nichol v. Mayor, &c., of Nashville, 9 Hump., 252; Louisville & Nashville R. R. Co. v. County of David-son, 1 Sneed, 637; Strickland v. Mississippi R. R. Co., cited 27 Miss., 209, 224; City of St. Louis v. Alexander, 23 Mo., 483; Police Jury v. Succession of McDonough, 8 La. Ann., 341; Cotten v. Commissioners of Leon County, 6 Fla., 610; Ryder v. Alton & Sangamon R. R. Co., 13 Ill., 516; Lumsden v. Cross, 10 Wis., 282; Knowlton v. Super-visors of Rock County, 9 Id., 414; Gilman v. The City of Sheboygan, 2 Black, 510.)

Although the general objection of unconstitutionality of any law passed by the legislature, authorizing subscriptions to stock in private corporations by county or city author-ities, to be met by taxes levied upon the citizens and prop-erty of such county or city, is presented by the appellant's answer, the question has not been discussed by appel-lant's counsel in this court. We have not, therefore, deemed it necessary to analyze the constitutional provision which is generally relied upon to impeach the validity of such laws, or to meet the arguments to which their oppo-nents generally resort to sustain their conclusions.

While, however, it is not claimed by the counsel of the appellant, in this case, that the legislature may not confer upon a municipal corporation authority to subscribe for stock in a railroad company and levy taxes to pay its sub-scription, he insists that this has not been legally and con-stitutionally done by the act in question. To sustain this assumption, he relies upon the doctrine laid down and recognized by this court in the case of The State v. Swisher, 17 Tex., 441. The law of this case is unques-tionably sustained by sound reasoning, as well as the high-

est authority, and the question decided by it is regarded
by us as correctly and conclusively settled. But we cannot
agree that it has any application to the case now before
the court. It is not a legitimate construction of the act to
incorporate the San Antonio and Mexican Gulf Railroad
Company to say that the legislature intended, or did
thereby confer, upon the citizens of the city of San Anto-
nio any legislative power whatever. The legislature may
grant authority as well as give commands, and acts done
under its authority are as valid as if done in obedience to
its commands. Nor is a statute, whose complete execution
and application to the subject-mater is, by its provisions,
made to depend on the assent of some other body, a dele-
gation of legislative power. The discretion goes to the
exercise of the power conferred by the law, but not to
make the law itself.

The law, in such cases, may depend for its practical
efficiency on the act of some other body or individual; still,
it is not derived from such act, but from the legislative
authority. Legislation of this character is of familiar use,
and occurs whenever rights or privileges are conferred
upon individuals or bodies, which may be exercised or not
in their discretion. And if it may be left to the judgment
of individuals or private corporations whether they will
avail themselves of privileges conferred by the legislature,
there is certainly no valid reason why the same may not
be done with citizens of a town or district, who, as a class,
are to be affected by the proposed act. (Williams v. Cor-
mack, 27 Miss., 221; Dubuque County v. Dubuque & Pa-
cific R. R. Co., 4 Iowa, 2, and cases referred to above.)

The next objection made to the judgment is, that the
railroad company had forfeited its charter by its failure to
construct any part of its road within the time prescribed
for the completion of its first section of twenty-five miles.
It may be inferred from the testimony, although it is not
alleged in the answer, and the court may not in strictness

be required to consider it, that· the coupons, upon which the suit is brought, were passed to the appellee subsequently to the period when, it is insisted, the charter had become null and void by the failure of the company to perform the required amount of work. Upon the hypothesis, however, that this question may be legitimately considered by the court, it is insisted for appellant, that the provision of the charter stipulating for the commencement and completion of sections of the road, is of the essence of the contract between the corporation and the stockholders. We cannot give our assent to this construction of the charter. This provision is not believed to have been supposed or intended by the subscribers as a part of the essence of the contract among themselves in organizing the corporation, nor as a matter of contract between the individual subscriber and the corporation as an aggregate. It was doubtless intended by the legislature, and understood by the subscribers, as a reservation and condition attached for the benefit of the public, to secure the speedy construction of an important public work, for the promotion of which many essential and valuable rights had been conceded. It was to protect the State from any future embarrassment, by reason of the privileges conferred upon this company, if the road should not be speedily, and in good faith, commenced and pushed forward to completion. The construction contended for by appellant would enable a discontented subscriber, by withholding the means upon which the company is dependent to perform the requirements of its charter, if not to insure its destruction, to escape, at least from many liabilities which he has assumed by becoming a member of it.

But it is also said, that if the commencement and completion of the first section of the road, as required in the original charter, was not an essential condition upon which appellant's contract of subscription was based, yet the char-

3—XXVIII.

---

---

ter became a nullity by its own stipulations, if these conditions were not strictly fulfilled.

To this it is answered, and we think correctly, that the provisions of the charter in this particular were enlarged and extended from time to time by subsequent amendments. It is not shown, it is true, that the applications for these extensions and amendments of its charter by the company were made with the consent of appellant, nor is it proved, with any considerable degree of certainty, that appellant, either directly or by implication, ratified or accepted them. But no objection has been taken to any of the provisions of the several amendments, except those extending the time within which the work was required to have been commenced and the different sections of it completed. And as these were for the benefit of the corporators, and a mere enlargement of their powers and privileges, they are presumed to have been obtained with their consent.

It is only fundamental alterations, such as work a change in the character of the company, or the purposes and objects to be attained by its organization, which operate as a release of the subscribers to the stock. (Benet v. Alton and Sangamon R. R. Co., 13 Ill., 504; Danbury and Norwich R. R. Co. v. Wilson, 22 Conn., 435.)

There is no error in the judgment, and it is therefore

AFFIRMED.