* CITED in M. E.R. Co. v. Sussex R. Co., 5 C.E. Gr.
564; Black v. Del. Rar. Canal Co., 7 C.E. Gr. 404, 416;S.C., 9 C.E. Gr. 464, 466; N.J. Midland R. Co. v. Strait, 6 Vr. 325.
THE CHANCELLOR.
The Hackensack and New York Railroad Company was incorporated in 1856, with power to construct a railroad from Hackensack to the Paterson and Hudson River Railroad, with a capital stock of two hundred thousand dollars, and with power to mortgage its road and lands, franchises and appurtenances, to the amount of fifty thousand dollars. Under this act, it laid out, located, and built a road five miles in length, terminating at Essex street, in Hackensack, within one mile of the court-house, as required by the charter. It borrowed thirty thousand dollars, for which it gave a mortgage upon the road and its equipment, franchises, and other property. By a supplement to this charter, passed March 12th, 1861, it was authorized to extend the road north wardly to Nanent, on the Erie railway, in the state of New York, a distance of about twelve miles, to increase the capital stock to any extent required, and to issue bonds to the amount of two hundred and fifty thousand dollars, which, in the words of the act, were "for the construction and equipment of the road to be constructed under this act, and to secure the payment of said bonds, the said company shall have power to mortgage the said road, with its franchises and chartered rights."
In 1861, the company extended its road under this supplement to a point on Passaic street, in the village of Hackensack, more than a mile from the court-house, the length of the extension being about a mile. After this, it executed a new *Page 181 
mortgage upon the whole road, as extended, and its equipments, and its franchises and chartered rights, to secure the payment of ten thousand dollars. No new stock was issued for this extension.
The company has recently, under the supplement of 1861, laid out and located another extension for about a mile and a half north of the present terminus, reaching from Hackensack to New Bridge, and has made contracts for the construction of it, and has, by resolution, determined to make a new mortgage to cover the whole road, as it will be when finished to New Bridge, with its equipments and appurtenances, and the chartered rights and franchises of the company, to secure one hundred bonds of one thousand dollars each, for the purpose of paying off the two mortgages which are now on the road; for relaying with new rails and ties the road first built, and furnishing it with the necessary equipment, which is now deficient for its business; and for constructing and equipping the extension to New Bridge.
The complainant is a stockholder in the company; and of nine hundred and thirty shares of capital stock issued, for one hundred dollars each, he owns three hundred and twenty-four. He applies for an injunction to restrain the defendants from constructing the extension to New Bridge, and from executing the mortgage proposed.
He opposes the extension, on the ground that it is a different enterprise from that for which his stock was taken, and the money paid, and that neither the directors, nor a majority of the stockholders, can compel him to embark his capital in any undertaking but the one for which it was subscribed and paid.
The extension to Nanent, authorized by the act of 1861, has never been submitted formally to the stockholders, nor has it in any way been approved of by them, or a majority of them, except by the assent given in the answer in this suit, to which the directors are made defendants, which is sworn to by the directors, individually, who own together five hundred and seventeen shares of the capital stock. *Page 182 
But of this, two hundred shares, held by one of them, Mr. Robert Rennie, is special stock, issued to him to build the Lodi Branch, which is leased to him during the existence of the company, and which he is to operate at his own expense and for his own profit, under an agreement that he shall pay as rent, the dividends that may be declared on these two hundred shares; and under another agreement, endorsed on the certificate of stock issued for these shares, that they are to be entitled to no dividends beyond the rent of the Lodi Branch, or in other words, that he is to pay no rent, and this stock is to receive no dividends. Under these circumstances, this stock can receive no benefit from the extension if it is profitable, nor sustain any loss from it if it is ruinous. And it would seem that if the consent of a majority of the shareholders was necessary to the new enterprise of the extension, that the assent of the other three hundred and seventeen shares held by the directors, not being a majority of the whole stock held by the complainant, who dissents, is not the consent of the majority of the stockholders. And, if it is necessary to obtain the consent of a majority to make the extension authorized by the supplement of 1861, that consent does not appear in the cause as now presented.
The extension authorized by the act of 1861, is a radical change in the object of this corporation; it is an enterprise entirely different from that in the charter. That was to construct and operate a railroad from Hackensack to the Paterson railroad, at Boiling Spring, an easy and almost direct route to New York; it was from a thriving village, the county town of Bergen county, over a level country, and only five miles in length, as shown by the return of its location. The extension would be about twelve miles in length, through an uneven country, mostly, if not wholly, agricultural; with no village, except the very small one at New Bridge, on its route; and it runs into the state of New York some distance, and terminates at a point on that part of the Erie railway which the company have abandoned for regular traffic, and on which few trains are run. It is an entirely different enterprise. *Page 183 
The question here is, can this company, either with or without the consent of a majority in interest, of its stockholders, compel the complainant to embark capital subscribed for the first enterprise, in this new one, entirely different.
Since the Dartmouth College case, in the Supreme Court of the United States, the doctrine has been considered firmly established, and been confirmed by repeated decisions, both in that court and the state courts, that a charter, granted by the legislature to a corporation, is a contract between the state and the corporators, and that the state can pass no act to take away or impair any of the franchises or privileges granted by it. The company, or artificial person thus created, and its property, is subject to all general laws and police regulations made by the legislature after such grant, in the same manner as natural persons and their property are; provided they are not such as to take away or impair any of the franchises plainly granted by the charter. This doctrine did not prevent the legislature from conferring new privileges upon any corporation, to be accepted at its own election.
It is also settled, upon the principles of the common law, in this state, and most of the states of the Union, that when a number of persons associate themselves as partners, for a business and time specified in the agreement between them, or become members of a corporation for definite purposes and objects specified in their charter, which in such case is their contract, and for a time settled by it, that the objects and business of the partnership or corporation cannot be changed, or abandoned, or sold out, within the time specified, without the consent of all the partners or corporators; one partner or corporator, however small his interest, can prevent it. And this is so, although by law a majority in either case can control or manage the business against the will and interest of the minority, so long as it is within the scope of the partnership or charter.
This rule is founded on principle, the great principle of protecting every man and his property by contracts entered into, a guiding principle in all right legislation, and incorporated *Page 184 
into the constitution of the United States, and of almost every state in the Union. And the rule is not changed because the new business or enterprise proposed is allowed by law, or has been made lawful since the association was formed.
The leading case on this subject is that of Natusch v.Irving, decided by Lord Eldon, in 1824. It is not contained in the regular reports, but may be found in the appendix to Gow onPartnership (3d ed.) 576, or in Lindley on Partnership, p.
511. There, a partnership was formed for life insurance, and after it was entered into, an act of Parliament made it lawful for such a firm to enter upon the business of marine insurance, which was prohibited to them before. A majority of the partners determined to embark in the business of marine insurance, thus made lawful. Lord Eldon held them barred by the contract of co-partnership, unless every partner agreed to alter it. In England, the same doctrine is applied to corporations rigidly, and is acknowledged in all cases on the subject. And although, from the omnipotent power of Parliament, restrained by no written constitution, they hold that the contract can be changed by act of Parliament, yet the English Court of Chancery will enjoin the directors or the corporation, on application of a single stockholder, from using the common funds to apply to Parliament for a change.
The doctrine of Natusch v. Irving was adopted in New York by Chancellor Kent, in the case of Livingston v. Lynch, 4Johns. C.R. 573, and in this state, by the decision of Parker, master, sitting to advise the Chancellor, in Kean v. Johnson
1 Stockt. 401, and has been recognized and adopted in almost all the states of the Union.
The opinion of Chancellor Bennet, in Stevens v. The Rutlandand Burlington R. Co., 29 Vt. 548, (also found in 1 Am. LawReg. 154,) contains a very able exposition and application of it. It will also be found in Ang. Ames on Corp., § 391-3,and § 536-9; Lindley on Part. 515; Pierce on Railways 78;Hart. N.H.R. Co. v. Crosswell, 5 Hill 383; Troy andRutland R. Co. v. Kerr, 17 Barb. 581; Macedon *Page 185 Plank Road Co. v. Lapham, 18 Barb. 312; Buff., Corn., andN.Y.R. Co. v. Pottle, 23 Barb. 21; Banet v. The Alton andSangamon R. Co., 13 Ill. 504; Graham v. Birkenhead R. Co., 2 McN. G. 156.
After the effect of the rule established in the Dartmouth College case began to be felt in the states, it was found that by the numerous acts of incorporation, freely and perhaps necessarily granted, great inconveniences resulted, and that provisions incautiously inserted, too much restricted the power of future legislatures; and that the laws, which experience showed were necessary to govern corporations in the exercise of their powers, could not be passed. And the legislature of many states, by degrees and successively, adopted the practice of inserting in acts granting franchises, that they might alter, modify, or repeal the act; and also, by general law, provided that all acts of incorporation thereafter passed, should be subject to such alteration and repeal.
The provision is contained in the general act of this state, passed in 1846, (Nix. Dig. 152, § 6,)* that such charters should be subject to alteration, suspension, and repeal, in the discretion of the legislature. This and all similar special and general provisions were intended for the purpose specified; to give to the legislature the clear right, at their pleasure, to alter or repeal the acts of incorporation. The state, without this, could have done it with the assent of the corporators. They could give them property; they could add to their powers or privileges. But they could not take away any power, privilege, or franchise, conferred by the act, nor compel them to exercise any new power or franchise conferred.
Besides this general law of the state, the charter of the defendants contains this provision, that "the legislature may, at any time, alter, modify, or repeal the same."
The object and purpose of these provisions are so plain, and so plainly expressed in the words, that it seems strange that any doubt could be raised concerning it. It was a reservation to the state, for the benefit of the public, to be *Page 186 
exercised by the state only. The state was making what had been decided to be a contract, and it reserved the power of change, by altering, modifying, or repealing the contract. Neither the words nor the circumstances, nor apparent objects for which this provision was made, can, by any fair construction, extend it to giving a power to one part of the corporators as against the other, which they did not have before.
It was to avoid the rule in the Dartmouth College case, not that in Natusch v. Irving, that the change was made. The words limit the power to that object.
On general principles, and the settled rules of construction, I would hold this to be the effect, and only effect, of the provision in the general act and in the charter of the defendants, without any hesitation, were it not for a series of decisions by most respectable courts, which hold that this provision obviates the effect of the rule in Natusch v.Irving, and Kean v. Johnson, and enables a majority of the corporators in all charters subject to a like provision, to change, by legislative permission, and within certain limits, the object and purpose of the corporation. They hold that the contract between associate corporators, that they will confine their business to life insurance, is changed by legislative permission to engage in marine insurance, or a contract to join in constructing a railroad from New York to Newark, can be changed to one from New York to Elizabeth by legislative consent. The reasoning is founded on the fact that the subscription for the stock, which is the contract, was made as in this case under a charter which authorizes a road from the Paterson road to Hackensack, and authorizes the legislature to alter and modify the act. And from this they infer that it is a contract to join in building any road that the legislature may, by such alteration, authorize the company to build; and that such authority, or additional privilege, may be accepted by a majority of the corporators.
So far as the alteration is made by the legislature, in a way to be compulsory on the corporation, this is correct; as, if they should require the company to build a double track, *Page 187 
or widen the draws in a bridge, or exact less fare or toll; these would be within the contract, or would be annexed to it as a condition, and every stockholder would take his stock subject to the contingency of such alteration.
But if the change in the act is simply offering the corporation the privilege of entering upon another and a different enterprise, it is not within the condition to the subscription. The only construction to be given is, that the legislature may alter, not that the stockholders may, as between each other. The case of Natusch v. Irving was decided upon this very ground. The act of Parliament had given the company the power to embark in marine insurance, but the consent of all the parties was still held necessary. The plain object of the reservation in this case was to give the legislature, not a bare majority of the stockholders, power.
This view of the case is so clear upon principle that I feel constrained to be guided by it, although the weight of the decisions in other states is against it.
In Maine the decisions of the Supreme Court are in accordance with it. In the case of The Meadow Dam Co. v. Gray,30 Maine 547, the company was incorporated to build a dam across navigable waters. Under the power reserved to alter and repeal, an act was passed requiring it to make in the dam, a lock for the benefit of public navigation. This was not increasing the powers or changing the enterprise of the corporation, but requiring, in the work authorized, an accommodation for the public, omitted in the original act. What the change was is not mentioned in the report, but it is stated in the Oldtown and Lincoln R. Co. v.Veasie, by Chief Justice Shepley, who delivered the opinion in both cases.
In the case of the Oldtown and Lincoln R. Co. v. Veasie, 39Maine R. 571, the act of incorporation, passed March 8th, 1852, authorized not less than eleven thousand, nor more than fifteen thousand shares. Veasie, August 13th, 1852, subscribed for one thousand shares; only nine thousand five hundred shares were subscribed. A supplement, passed September, 1853, under the power reserved to alter, fixed the capital *Page 188 
at not less than eight thousand, nor more than twenty-five thousand shares. This was accepted by the directors. Veasie was sued for his subscription, and objected on the ground that until the supplement was passed, the number of shares required to constitute the company not having been subscribed, he could not be sued for his subscription, and that the legislature under the power reserved, although they might alter the charter, could not affect the rights of the stockholders between themselves, or change their contract with the company.
The court held that he was not liable under the original act, to be sued until eleven thousand shares were subscribed for, and that the power to amend did not authorize a change in the rights or liabilities of the corporators between themselves.
Chief Justice Shepley says (p. 580): "The legislature might as well have attempted to alter a contract between the corporation and one of its members respecting the construction of the road, as a contract respecting any part of its capital. If a corporation, being party to a contract with one of its corporators, might, by the assistance of the legislature, absolve itself from the performance of any part of the contract, it might from the whole, and might require payment of the money subscribed, without allowing the subscriber to derive any benefit from it. It is the charter only, and the rights and liabilities of the corporators as such in consequence thereof, that can be varied by an act of the legislature, and not the private contracts made between the corporation as one party, and its corporators as the other."
Now in this case, the private contract between the stockholders and the corporation, or between them mutually, on subscribing for the stock, was that their enterprise was the road from the Paterson railroad to Hackensack, and the power reserved was not to authorize any of the parties to this private contract, at their pleasure, to violate it. The supplement of 1861 does notrequire the extension to be built; it only authorizes it at the option of the corporation. The words *Page 189 
are, "it shall be lawful for said company to extend their railroad." And it is held in England, where the courts by mandamus compel a company to construct the road it is incorporated to construct, that an act giving the privilege of extension is not obligatory on the company, and the mandamus is in such case refused, York and Midland R. Co. v. Regina, 1Ellis Bl. 858; in which the Exchequer Chamber reversed the decision of the Common Bench, in 1 Ellis Bl. 178, in the same case.
In New York a different rule has been established, and it is held that the power to alter will authorize the company, by consent of the legislature, to extend its enterprise without the consent of the stockholders. The rule was first adopted to enable companies to subscribe to the stock or bonds of other enterprises that brought business to them, and then was extended to cases where they were authorized to build extensions or branches to their own works. North R.R. Co. v. Miller, 10 Barb. 260;White v. Syracuse and Utica R. Co., 14 Barb. 560; Sch. andSar. Plank R. Co. v. Thatcher, 11 New York R. (1 Kern.) 102; Buff. and N.Y. City R. Co. v. Dudley, 14 New York R.
(4 Kern.) 336. The reasoning of the judges in these cases does not satisfy me. The courts which decided the first cases would not have adopted the principles which guided them, if they had been asked to apply it to a case like this, or like the later cases in New York.
In 14 Barb. 570, Judge Edwards, in delivering the opinion of the court, says, that under this reservation the legislature cannot create a new company with a new and distinct business, but that in the case before them, the company would remain the same as to its character, structure, objects, and business. It would have the same road, the same buildings and property, with the same agents, as it would have if the law had not been passed. But the principle of power to let a majority alter, is the same whether the alteration be great or small, and courts and exercise no discretion as to the extent of change which the company, by permission of the legislature, may adopt. *Page 190 
In the case of the Sch. and Sar. Plank R. Co. v. Thatcher,11 N.Y. 109, the court put their decision on the ground that the change was unimportant, and would not injure the defendant; and seem, by their reasoning, to admit that if the change had been as great as in the case of the Hartford and New Haven R.Co. v. Croswell, they would have decided differently.
In The Buffalo and New York City R. Co. v. Dudley,14 N.Y. 355, Selden, J., in delivering the opinion of the court, places the decision on the ground that it was ruled in the case just quoted "that no mere addition to, or alteration of the charter, however great, could operate to discharge a stockholder from his obligation to the corporation," and he questions the soundness of the decisions in the Hartford and NewHaven R. Co. v. Croswell. These decisions are not sufficiently consistent, or so based upon the principles that should govern this case, as to influence me to depart from the conclusions arrived at.
The Supreme Court of Massachusetts has followed the decisions in New York, and in the well considered and well argued case ofDurfee v. The Old Colony R. Co., 5 Allen 230, arrived at the conclusion that the reserved right to alter and repeal authorized a company to engage in a new enterprise, without the consent of all the shareholders. The reasoning of the able counsel who combated this position contains the best exposition of the law that I have found any where. The reasoning of Chief Justice Bigelow, in delivering the opinion of the court, does not convince me. He places the decision upon principles not acknowledged in this state, and relies upon the two cases in Maine, cited above, as well as those in New York, as supporting his view. He assumes (on p. 244), that it is the object of the provision, that an amendment may be made by the consent of bothparties, the legislature on the one side, and the corporation on the other; the former expressing its assent by a legislative act, and the latter by a vote of the majority of stockholders; and observes "that it is nothing more than the ordinary case of a stipulation *Page 191 
that one of the parties to a contract may vary its terms, with the consent of the other contracting party."
Now in this state it is settled that an alteration made by the legislature, under this reserved power, is valid and binding, without the consent, and against the will of the corporation, and all its members. The two decisions in the Court of Errors, not yet reported,* upon the charters of the Morris and Essex Railroad Company, and of the Jersey City and Bergen Railroad Company, settle that the legislature may, against the will of the companies, change the mode of taxation prescribed in their charter for one more burthensome.
And the rule of the common law as to contracts, adopted here, gives the power to the parties, where both assent, to alter any contract without the stipulation for that purpose, which would seem from the language of the opinion, to be ordinarily
inserted for it in Massachusetts. Such stipulation is seldom or never made in New Jersey.
This view, that the object of the reserved power was to give the majority of the corporators the power to control the minority, with the consent of the legislature, has never been adopted in this state. The act of Massachusetts, Statutes 1831,ch. LXXXI., to which reference is made, contains no provision as to consent of the stockholders, but is a pure, simple reservation of power, like the act of New Jersey.
The decisions in the cases of Banet v. Alton and Sang. R.Co., 13 Ill. 504, The Pacific Railroad v. Renshaw, 18Missouri 210, The Pacific Railroad v. Hughes, 22 Missouri
291, hold that the majority of the stockholders, by authority of the legislature, may make a change, provided it is not great or a radical one. They, in express terms, say that a change like this would not be warranted, and so far as of authority, are on the side of the complainant.
But the principle on which they are decided is wrong; and if it is once conceded that a majority of the corporators may, by authority from the legislature, change the object of the enterprise in small things, there is no principle of law by which they can be restrained in any a little larger, or in the *Page 192 
character of the whole work. The same principle will lead the courts of Illinois and Missouri, as it did those in New York, to allow radical changes, and must, if consistently applied, allow a charter for a railroad to be used for banking or insurance business, or for a canal, theatre, brewery, or beer saloon.
There is no other alternative to the proposition, that while the power reserved authorizes the legislature, within certain limits, to make such alterations as they choose to impose, it gives no authority, when the legislature does not impose them, for the majority to adopt such alterations or enter upon such enterprises as are allowed by the legislature.
Again, the power of the legislature has its limits. It can repeal or suspend the charter; it can alter or modify it; it can take away the charter; but it cannot impose a new one, and oblige the stockholders to accept it. It can alter or modify the old one; but power to alter or modify anything can never be held to imply a power to substitute a thing entirely different. It is not the meaning of the words in their usually received sense. Power to alter a mansion-house would never be construed to mean a power to tear down all but the back kitchen and front piazza, and build one three times as large in its place. In anything altered, something must be preserved to keep up its identity; and a matter of the same kind, wholly or chiefly new, substituted for another, is not an alteration; it is a change.
In some cases there might be room for doubts, but in this case there can be no hesitation in saying that a railroad of seventeen miles from the Paterson road to Nanent, is a change and substitution of one work for another, and not an alteration of the road to Hackensack. They are substantially two different enterprises.
Again, the power is to alter or modify the act, and the true construction of this I hold to be, an alteration of something contained in or granted by the act. Any of the franchises granted may be altered; the right to take land by condemnation, the right to take tolls or fare, or the amount *Page 193 
to be taken. But the legislature had no right to impose upon the company any other duty, or anything involving any other duty, than that attending the building a railroad from the Paterson road to Hackensack; anything in the manner of doing that they had a right to change. They could not oblige it to dam and drain all the meadows along the Hackensack, or to construct a canal, or to build a road from Hoboken to Newark, nor could they oblige it to extend its road to Nanent. They could as well oblige it to run to the Pacific. We must keep in mind that by the decisions in New Jersey the company need not accept the alterations; they are bound by them without acceptance if within the power reserved.
By a wider construction of this power any of the main lines of railroad running through the state, incorporated since 1846, or by an act which has in it the power of alteration, may be compelled to build and run a branch to any village or place near that route, that the legislature may direct. It must be held that the power to alter and modify does not give power to make any substantial additions to the work.
Again, the act of 1861 does not, in fact, alter or modify the act of 1856 in any one thing embraced in it. That act, and every power and franchise granted by it, and any duty it imposed, remains the same. And the defendants can now go on under it precisely as if the supplement had not been passed. The company is authorized to construct another road; it is not compelled to do it. If it builds it, or if it does not, its old charter remains with all its franchises and privileges intact, and no new burthens imposed, except so far as it assumes them. This is in no sense of the word an alteration of the charter. It would be as absurd to say that an owner had altered his house, who had built a larger one on an adjoining lot. And until the legislature have made a valid alteration of the charter, the rights of each stockholder are as held in Kean v. Johnson; he can prevent all the others from changing or abandoning the work.
The supplement of 1861 is a perfectly valid and constitutional act. It is a grant of privileges that the legislature have *Page 194 
a right to grant, as they could grant to this corporation the right to conduct banking or insurance business, or to run a ferry across the North river; but the company is restrained by the law of corporations and partnerships, from expending the money or using the credit of the corporation in such enterprises, unless every shareholder consents.
The extension to Passaic street, both because it comes within the grant in the charter, and more especially because every shareholder must be held to have consented to it by acquiescing in its construction and maintenance for years, must be decided to be lawful.
The defendants must be restrained from extending the road beyond its present terminus at Passaic street, and from expending any money of the company to pay for any such extension, or from giving any mortgage for the cost of such extension.
There is no foundation for an injunction against a mortgage for any lawful object, on either part of the road. There is great doubt whether a mortgage on either of the two parts of the road heretofore constructed, for the cost of the other, would pass the franchises of the company in such mortgaged part, but it would be valid as to the property other than franchises, which the company can mortgage without any special power. And besides, the bonds of the company, or its lawful contracts, would entitle the holder to recover upon them, and under the judgment, by the act of 1858, (Nix. Dig. 719,)* the whole road and franchises could be sold. The complainant, therefore, cannot be injured by a mortgage, whether valid or not, upon any part of the road.
* Rev., p. 178, § 6.
* Since reported in 2 Vr. 521; Id. 575.
* Rev., p. 945.
 *Page 401